[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 5, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-10266

_____

Agency Docket No. 4911-149-V-01-0

THE SIERRA CLUB,

Petitioner,

versus

MIKE LEAVITT, in his official capacity as
Administrator of the United States Environmental
Protection Agency,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents,

OGLETHORPE POWER CORPORATION,

Intervenor-Respondent.

_____

Petition for Review of an Order of the
Environmental Protection Agency

_____

**(May 5, 2004)**

Before ANDERSON, CARNES and MARCUS, Circuit Judges.

ANDERSON, Circuit Judge:

## I.  INTRODUCTION

This case arises out of Sierra Club's effort to block Oglethorpe Power Corporation ("Oglethorpe") from obtaining a permit for a portion of the Wansley Steam-Electric Generating Plant ("Plant Wansley"), a power plant in Heard County, Georgia.  On November 30, 2000, Oglethorpe applied to the Georgia Environmental Protection Division ("EPD") for a permit for Block 8 of Plant Wansley, the Wansley Combined Cycle Energy Facility ("Block 8").  EPD granted the permit over Sierra Club's objections on January 15, 2002.  Sierra Club then petitioned the Environmental Protection Agency ("EPA") to object to EPD's decision under 42 U.S.C. § 7661d(b)(2).  EPA declined to object.  Sierra Club appeals directly to this Court as provided in 42 U.S.C. § 7661d(b)(2) and 42 U.S.C. § 7607(b).

### A.  The Clean Air Act and the Georgia Rule

The Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, requires EPA to publish lists of emissions that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare, and to promulgate primary and secondary national ambient air quality standards (NAAQS) for such pollutants."  Alaska Dep't of Envtl. Conservation v. EPA, 124 S. Ct. 983, 991

2

(2004) (citing 42 U.S.C. §§ 7408(a) and 7409(a)) (marks omitted).  NAAQS

"define [the] levels of air quality that must be achieved to protect public health and

welfare."  Id. (citing R. Belden, Clean Air Act 6 (2001)).  The CAA then gives the

tasks of implementing, maintaining, and enforcing NAAQS to individual states.  Id.

States must develop, and seek EPA approval for, state implementation plans

("SIPs"), which must "include enforceable emission limitations and other control

measures, means, or techniques . . . as may be necessary or appropriate to meet the

applicable [CAA] requirements."  Id. (citing 42 U.S.C. § 7410(a)(2)(A)).

Among other requirements, the CAA mandates that SIPs require permits for

the construction of new or modified "major stationary sources"[1] located in

"nonattainment areas," where the air fails to meet NAAQS.  42 U.S.C. § 7503.  We

refer to this type of permit as a "preconstruction" permit.  The CAA specifies that

no preconstruction permit may be issued unless

> the owner or operator of the proposed new or modified source has
> demonstrated that all major stationary sources owned or operated by

---

[1]     The "major stationary source," a fundamental monitoring and compliance unit
under the CAA, is an aggregation of contiguous air pollution sources which collectively emit
certain levels of pollution.  Title V of the CAA defines "major stationary source" as "any
stationary source (or any group of stationary sources located within a contiguous area and under
common control)" that (1) "emits or has the potential to emit considering controls, in the
aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of
any combination of hazardous air pollutants" or (2) "emits, or has the potential to emit, one
hundred tons per year or more of any air pollutant."  42 U.S.C. § 7661(2) (incorporating 42
U.S.C. § 7412(a)(1) (CAA § 112); 42 U.S.C. § 7602(j) (CAA § 302 or part D of Title I)).

such person (or by any entity controlling, controlled by, or under common control with such person) in such State are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under this Act[.]

42 U.S.C. § 7503(a)(3). Georgia has adopted the CAA's language nearly verbatim. See Ga. Comp. R. & Regs. r. 391-3-1-.03(8)(c)3 (hereinafter the "Georgia Rule" or the "Rule"). The present dispute arises under this Georgia permit requirement.[2]

In addition to the preconstruction permit described above, Title V of the CAA requires sources to have operating permits. 42 U.S.C. §§ 7661-61f; 40 C.F.R. parts 70, 71.[3] Title V imposes no new requirements on sources. Rather, it consolidates existing air pollution requirements into a single document, the Title V permit, to facilitate compliance monitoring. Sources subject to Title V may not operate in violation of, or without, a Title V permit containing all applicable requirements. 42 U.S.C. §§ 7661a(a); 40 C.F.R. §§ 70.7(b), 70.6(a)(1).[4] SIP

---

[2] Heard County, where Plant Wansley is located, is an attainment area. However, the parties agree that Heard County sources must meet the requirements of Georgia Rule 391-3-1-.03(8)(c) because they contribute to the metropolitan Atlanta ozone nonattainment area. Ga. Comp. R. & Regs. r. 391-3-1-.03(8)(e)1.

[3] Part 70 applies to state-implemented Title V permit programs, and Part 71 applies to Title V programs administered by EPA where there is no EPA-approved state program in place.

[4] The CAA requires permits to contain emissions limitations and a compliance schedule, 42 U.S.C. § 7661c(a), monitoring procedures, § 7661c(b), and inspection, monitoring, certification, and reporting requirements to assure compliance with the permit, § 7661c(c).

4

requirements are, of course, applicable requirements. Because the Georgia Rule is part of Georgia's SIP, Title V permits in Georgia are subject to the Georgia Rule's preconstruction permit requirement.

B. Sierra Club's Challenge to Oglethorpe's Permit

Plant Wansley, is an approximately 5,200-acre site located in Heard County, Georgia, consisting of two 880-megawatt coal-fired units, one 50-megawatt oil-fired combustion turbine, and ancillary equipment. On July 28, 2000, Georgia Power, the owner of Plant Wansley, received a permit to build four new "power blocks" for the plant, Blocks 6, 7, 8, and 9.[5] Subsequently, Georgia Power decided to transfer one as yet unbuilt power block, Block 8, to Oglethorpe, and another, Block 9, to the Municipal Electric Authority of Georgia ("MEAG"). On November 30, 2000, Oglethorpe applied to EPD for a joint preconstruction and Title V permit for Block 8. EPD has repeatedly noted that Blocks 6,7,8, and 9 operate under common control and continue to comprise the same Title I and Title V site.[6]

---

[5] EPD describes each "power block" as "One natural gas-fired only combined-cycle block which will generate a total of approximately 521 megawatts (MWs) of electric power. The combined-cycle block includes two combustion turbines, two supplementary fired heat recovery steam generators and one steam turbine." See, e.g., Part 70 Operating Permit, Wansley Combined Cycle Energy Facility, Permit No. 4911-149-0006-V-01-0 (Jan. 15, 2002) at 1.

[6] See Prevention of Significant Air Quality Deterioration Review of the Oglethorpe Power Corporation Wansley Combined-Energy Facility, Power Block 8 (Preliminary Determination) (Aug. 2001) at i ("The overall Wansley Electric Steam Generating Facility will continue to be considered a common Title I and Title V facility between Georgia Power, OPC [Oglethorpe Power Corporation], and MEAG."); Part 70 Operating Permit (Draft), Wansley

Sierra Club argues that Oglethorpe is a part owner of noncompliant Plant Scherer, and therefore Oglethorpe could not satisfy the Georgia Rule and EPA should have objected to its permit.[7] EPA rejected this argument. We conclude that in reaching its conclusions, EPA failed to consider important aspects of the problem, and thus acted arbitrarily and capriciously.[8]

## II.  DISCUSSION

As explained above, the Georgia Rule, in accordance with the CAA, provides that EPD may not grant preconstruction permits for major stationary sources to applicants that own or operate noncompliant major stationary sources.

---

Combined Cycle Energy Facility, Permit No. 4911-149-0006-V-01-0 (Sept. 14, 2001) at 1 ("The Wansley Steam-Electric Generating Plant [Blocks 6 and 7], the Wansley Combined Cycle Energy Facility [Block 8], and the Municipal Electric Authority of Georgia -Wansley Unit 9 [Block 9] comprise the same Title V site because the plants are located on contiguous property, operate under common control, and have the same two digit SIC code."); Part 70 Operating Permit (Final), Wansley Combined Cycle Energy Facility, Permit No. 4911-149-0006-V-01-0 (Jan. 15, 2002) at 1 ("The Wansley Steam-Electric Generating Plant . . . the Wansley Combined Cycle Energy Facility . . . and the Municipal Electric Authority of Georgia -Wansley Unit 9 . . . comprise the same Title V site."); Prevention of Significant Air Quality Deterioration Review of the Oglethorpe Power Corporation Wansley Combined-Energy Facility, Power Block 8 (Final Determination) (Jan. 2002) at 3 (specifically rejecting Oglethorpe's contention that Block 8 should not be considered under "common control" between Oglethorpe and Georgia Power).

[7]     Oglethorpe argues as a threshold matter that it cannot be denied permits on the basis of noncompliance by Plants Bowen or Scherer because although there are EPA enforcement actions pending against each plant, neither has been finally adjudicated. We decline to address this argument because the agency decision under review did not reach the question of whether the Plant Scherer stationary source was not in compliance because the enforcement action had not been fully adjudicated. On remand, Oglethorpe is of course free to present this argument to the agency for its decision in the first instance.

[8]     We reject other arguments of the Sierra Club. See infra note 13.

Ga. Comp. R. & Regs. r. 391-3-1-.03(8)(c)3. The problem in this case is that Oglethorpe owns part of a noncompliant major stationary source, i.e., Plant Sherer, and the Rule is unclear regarding such situations. When the CAA or its implementing regulations are ambiguous, we defer to the EPA's reasonable interpretation. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82 (1984). However, it would not be appropriate to defer to EPA's interpretation at this time because in reaching its interpretation, EPA failed entirely to address or explain part of the problem it faced. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2866-67 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S. Ct. 1598, 1607 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to

remand to the agency for additional investigation or explanation.").  Without

considering the issue at all, the EPA Order implicitly assumed a positive answer to

the question of whether a major stationary source can be broken into parts with

compliance determined individually for purposes of the Georgia Rule.  And

without explanation or acknowledgment, the agency gave a term two different

meanings in a single regulatory sentence.  We do not defer in such a situation.

Sorenson v. Sec'y of Treasury, 475 U.S. 858, 860, 106 S. Ct. 1600, 1606 (1986)

("[I]dentical words used in different parts of the same act are intended to have the

same meaning."); see also New York v. Sullivan, 889 F.2d 401, 410 (2nd Cir.

1989) (stating that arbitrary and capricious review is "functionally equivalent" to

the Chevron reasonableness test), aff'd sub nom. Rust v. Sullivan, 500 U.S. 173,

111 S. Ct. 1759 (1991).[9]

---

[9]     We note that it is unclear whether Chevron deference applies to EPA's
interpretation of the Georgia Rule because the Rule is a state regulation which EPA is not
specifically charged with administering and enforcing.  The question of deference to federal
agency interpretations of state statutes or regulations has not been discussed extensively in the
courts.  The Supreme Court has held that EPA's interpretation of state environmental permitting
regulations is due deference "at least insofar as [the state regulations] affect the issuance of a
permit in another state."  Arkansas v. Oklahoma, 503 U.S. 91, 110, 112 S. Ct. 1046, 1059 (1992).
 In Riverside Cement Co. v. Thomas, 843 F.2d 1246 (9th Cir. 1988), the Ninth Circuit, noting
that EPA's enforcement role under the provision at issue there was "secondary," determined that
"EPA may either accept or reject what the state proposes; but EPA may not take a portion of
what the state proposes and amend the proposal ad libitum."  Id. at 1248.  In Montgomery Nat'l
Bank v. Clarke, 882 F.2d 87, 92 (3rd Cir. 1989), the Third Circuit deferred to the Comptroller of
the Currency's interpretation of a state statute "that serves as [the] federal agency's rule of
decision" where "the issue raised by the unsettled question of state law falls squarely within the
federal agency's field of expertise and the state courts or state agency charged with administering

The first step in interpreting a text is, of course, to examine its language.  See

United States v. Fisher, 289 F.3d 1329, 1337-38 (11th Cir. 2002).  The Georgia

Rule states:

> [N]o permit to construct a new or modified major stationary source [in a nonattainment area] shall be issued unless . . . (3) The owner or operator of the proposed new or modified source has demonstrated that all major stationary sources owned or operated by such person (or by an entity controlling, controlled by, or under common control with such person) in this State, are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under the Act[.]

Ga. Comp. R. & Regs. r. 391-3-1-.03(8)(c)3.  The plain reading of this provision is

that an owner or operator of a noncompliant major stationary source may not

receive a new Title V permit.  The Rule is not clear, however, regarding how to

treat a partial owner of a noncompliant major stationary source.  EPA read the Rule

as inapplicable to partial owners of noncompliant major stationary sources so long

---

the state statute have not ruled out the interpretation of the statute proffered by the federal agency."  Id. at 92.  Finally, the U.S. District Court for the Southern District of West Virginia decided with reservation to defer to reasonable EPA interpretations of West Virginia water regulations because of EPA's knowledge and expertise in the area, Ohio Valley Envtl. Coalition v. Horinko, 279 F. Supp. 2d 732, 754-56 (S.D.W.V. 2003), but determined that the particular EPA interpretation it reviewed was unreasonable, id. at 756-57.

Although the Georgia Rule may not directly and immediately affect permitting in other states, Arkansas v. Oklahoma, 503 U.S. at 110, 112 S. Ct. at 1059, we note that it does track the language of the CAA, and we suspect that an interpretation of the Georgia Rule is sufficiently intertwined with the administration of the CAA that it can be considered part of the federal law of air pollution control.  However, because we conclude below that we would owe no deference in the present circumstances, we decline to determine whether the Chevron doctrine applies.

9

as the portions they own are compliant.  EPA stated:

> [T]he plain language of [the Georgia Rule] suggests that it aims to ensure that an entity applying for a construction permit demonstrates that all of its major sources in Georgia meet their compliance obligations[.] . . . <u>Oglethorpe Power</u> is the "owner or operator" that <u>was obligated to demonstrate that all major stationary sources owned or operated by Oglethorpe Power . . . in Georgia satisfy the rule's compliance obligations</u>.
>
> * * *
>
> Oglethorpe Power has admitted it owns portions of only Units 1 and 2 at Plant Scherer.  However, the EPA Notice of Violation cited by the Petitioner alleges non-compliance only as to Plant Scherer's Units 3 and 4.  It is not clear from the plain language of [the Georgia Rule] that it requires an owner or operator to make any demonstration as to [noncompliant] <u>facilities</u> it does not own or operate, even if they are located at the same plant site as <u>facilities</u> it does own or operate.  . . . Thus, with respect to Plant Scherer, EPA sees no reason to question EPD's determination that all of Oglethorpe Power's <u>facilities</u> in Georgia are in compliance with all applicable requirements.

Order Denying Petition for Objection to Permit at 6 (citations omitted) (emphasis added).

Although the EPA Order did not explicitly acknowledge doing so, the agency  appears to have determined that the Georgia Rule allows breaking major stationary sources into constituent parts with compliance determined individually.  But that interpretation requires giving the term "major stationary source" its ordinary meaning in its first appearance in the Rule and redefining or ignoring it in its second appearance in the very same sentence.  This appears to be why EPA

10

shifted from speaking of "major stationary sources" to speaking of "facilities" when explaining its interpretation. We emphasize and add subscript to the text of the Georgia Rule to highlight EPA's disparate uses of the term "major stationary source":

> [N]o permit to construct a new or modified major stationary source$_1$ [in a non-attainment area] shall be issued unless . . . (3) The owner or operator of the proposed new or modified source has demonstrated that all major stationary sources$_2$ owned or operated by such person . . . are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under the Act[.]

Ga. Comp. R. & Regs. r. 391-3-1-.03(8)(c)3 (emphasis added). Thus the EPA Order seems to treat "major stationary source$_1$" as an ordinary major stationary source for Title V permitting purposes. But then, and without any explanation, "major stationary source$_2$" becomes EPA's new term, "facilities."

EPA's interpretation is in tension with the language of the Georgia Rule. The Rule and the CAA require owners or operators to demonstrate compliance of their "major stationary sources" – not to demonstrate compliance of their "facilities" or anything else. Because Congress used the term "major stationary source" twice in the CAA, and the EPD reproduced it twice in the Georgia Rule, the ordinary assumption would be that both Congress and the EPD intended the term to appear twice rather than to be ignored or replaced in one instance. See

11

United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) ("[W]e must presume that Congress said what it meant and meant what it said.").  Moreover, the ordinary interpretation of a term's appearance twice in one sentence is that it has the same meaning in each instance and is not intended to be ignored or replaced in either instance.  See Sorenson, 475 U.S. at 860, 106 S. Ct. at 1606 ("[I]dentical words used in different parts of the same act are intended to have the same meaning."); TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (marks omitted).  These principles of statutory interpretation are not absolute, but EPA should offer something more before abandoning them.

The EPA Order in this case provides no such justification.  In the Order, the EPA failed even to note that it has defined the same term, major stationary source, in two different ways, and it failed to acknowledge, much less explain or justify, the implicit policy decision driving the creation of the two definitions – that for purposes of the Georgia Rule, "major stationary sources" may be broken into separate parts with compliance determined individually.  The Order simply noted Sierra Club's assertion that Plant Scherer is under the common control of

12

Oglethorpe and Georgia Power,[10] and then summarily concluded that Oglethorpe need not demonstrate that the major stationary source, i.e., Plant Scherer, was compliant, because Oglethorpe owned only two of the four units at Plant Scherer and because only the two units owned by Georgia Power are noncompliant. However, given that the "major stationary source" is the unit Title V uses to monitor compliance, it is unclear whether it is appropriate to determine the compliance of part of a major stationary source. EPA's Order ignored these matters altogether. Because the EPA Order failed entirely to address or explain the different meaning it placed upon the same term, and the related matters above noted, it would not be appropriate to defer to the agency's determination at this time. State Farm, 463 U.S. at 43, 103 S. Ct. at 2866-67.

For the first time in its brief on appeal, EPA offers a post-hoc rationale for the disparate treatment of the same term in its two appearances in the Georgia Rule. EPA now suggests the term "major stationary sources" has in its first appearance its established meaning in the permitting context, but that the same term has a different meaning in its second appearance. EPA suggests that, for permitting

---

[10]     Because the EPA does not deny that Plant Scherer is under the common control of Oglethorpe and Georgia Power, we assume the same arguendo, without the necessity of a decision. Similarly, we assume arguendo that the Plant Scherer major stationary source is not in compliance. See supra note 7.

purposes, emissions from multiple units or separate sources have to be aggregated so that any group of stationary sources located within a contiguous area and under common control are counted as a single "major stationary source." EPA implicitly acknowledges that the several units at Plant Scherer, including those of Georgia Power and Oglethorpe, were under common control for permitting purposes.

However, EPA's post-hoc reasoning is that the purpose of the statewide compliance rule at issue in this case is entirely different, and is designed only "to ensure that an entity that owns or operates one or more Title V sources that are not currently in compliance . . . is not allowed to obtain a permit that authorizes the construction of a new source until its existing sources are . . . compliant." EPA Brief at 24-25. On the other hand, it would seem that the Georgia Rule is speaking of compliance of major stationary sources, not entities, because the Rule employs the term "major stationary sources" and because that term, unlike "entities," has an established meaning for purposes of demonstrating compliance with the CAA and its implementing regulations. However, because EPA's rationale is offered only as a litigation position in its brief on appeal, and was not articulated or explained by EPA in its Order in this case, or in any rule or regulation brought to our attention, we decline to address the merits of EPA's new argument. Whether its rationale has merit, and whether it follows that EPA should focus not on the major stationary

14

source itself but rather only on the part thereof owned by the applying entity, are matters that should be addressed in the first instance by the agency possessing the expertise and charged with the responsibility of administering this regulatory program. Florida Power & Light Co., 470 U.S. at 744, 105 S. Ct. at 1607 ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

Also for the first time in its brief on appeal, EPA argues that a focus upon the term "major stationary source," as urged by the Sierra Club, would render meaningless the subsequent inquiry prescribed under the Rule – "i.e., the inquiry into whether those major stationary sources are 'owned or operated by such person (or by an entity controlling, controlled by, or under common control with such person).'"[11] EPA Brief at 25. Even in its brief, however, EPA does not explain how the requirement of including controlling entities renders meaningless or even

_____

[11] The EPA Order did notice that the Georgia Rule suggests that it was aimed at ensuring that an entity applying for a permit demonstrate that all of its major stationary sources in Georgia meet their compliance obligations. However, the Order did not indicate that that requirement, or the inclusion of controlling entities, was in any way inconsistent with the separate requirement that it is the entity's other "major stationary sources" which have to be in compliance.

15

conflicts with, the fact that it is the "major stationary source" which has to be compliant. In other words, the Rule would seem to embrace two separate but consistent concepts: both the fact that it is an entity's other "major stationary sources" which have to be compliant; and the fact that the requirement extends also to entities that control the original entity. In any event, this is again a post-hoc rationalization offered for the first time as a litigation position in this case. Again, we decline to address the merits.

Finally, EPA argues for the first time in its brief on appeal that the sole purpose of the Georgia Rule at issue here (and necessarily the statutory provision which the Rule tracks) is to provide an additional incentive for any applying entity to bring all of its major stationary sources into compliance. EPA implies that the incentive would not operate if the other, noncompliant major stationary source were merely owned in part by the applying entity and the applying entity's partial ownership was not itself the cause of the noncompliance. Again we decline to address this post-hoc rationalization; the existence <u>vel non</u> of influence that might be exerted by a part-owner on its noncompliant joint venturer, and the significance thereof, is a policy matter best addressed in the first instance by the agency.[12]

---

[12] Finally, EPA's interpretation of the Georgia Rule may have national implications. As discussed above, the Georgia Rule tracks language in the CAA. <u>See</u> 42 U.S.C. § 7502(c); 42 U.S.C. § 7503(a). Therefore, if EPA applies its interpretation consistently in the future, then it

CONCLUSION[13]

would seem to have adopted a nationally applicable CAA interpretation. It is for the Administrator of the EPA, not this Court, to judge whether EPA has made a determination of nationwide scope. See 42 U.S.C. § 7607(b)(2). Of course, if the Administrator makes such a finding in the future, then appeals of EPA's action should be filed in the D.C. Circuit rather than this regional Circuit. See id. We call attention to this issue because we note that the parties failed to call it to our attention, and may also have failed to advise the agency; the Court noted the issue at oral argument.

[13] The Sierra Club argued before the agency that because Block 8 is part of the major stationary source, Plant Wansley, and because this major stationary source is under the common control of Georgia Power and Oglethorpe, then Georgia Power, as well as Oglethorpe, is an "owner or operator of the proposed new or modified source." Thus, the argument went, Oglethorpe has to make a demonstration with respect to the compliance of other major stationary sources owned by Georgia Power, as well as the demonstration with respect to Oglethorpe's own. See EPA Order at 5, 6-7, apparently addressing this argument, which it labeled as the Sierra Club's second argument. Similarly, in the summary of its argument in its brief on appeal, the Sierra Club refers to this argument in one sentence: "In addition, EPA should have objected to the Title V permit because the Wansley Combined Cycle Energy Facility is under the common control of Oglethorpe and GPC." Sierra Club Brief at 23. However, this argument is not referred to again in the brief. Consequently, Oglethorpe in its brief argued that this theory has been waived or abandoned. In its reply brief, the Sierra Club did not respond to Oglethorpe's waiver argument. Under such circumstances, we decline to address the argument. In light of the fact that this matter is being remanded in any event to the agency, EPA may of course in its discretion address the theory and expand upon its rather summary disposition in its previous Order. That is, we assume, but do not decide, that the agency would have authority to excuse such a waiver and address the merits of an issue, if, for example, the agency deemed that a potential polluter was attempting to avoid regulation that the law intended by splitting up a proposed major stationary source or by allotting ownership of a major stationary source to a friendly but uncontrolled entity. Moreover, the issue of whether the statute and regulations contemplate considering the owner or operator of the Plant Wansley major stationary source in its entirety, on the one hand, or whether they contemplate considering only the owner or operator of a part thereof, on the other hand, would seem to be the same or similar issue to that which the agency will consider pursuant to our remand with respect to the Plant Scherer major stationary source.

We reject without need for further discussion other arguments asserted by the Sierra Club, including the argument that Georgia Power actually operates Oglethorpe's Block 8 of Plant Wansley because Georgia Power controls the water supply; with respect to the latter, we defer to the decision reached in the EPA Order.

17

For the foregoing reasons, we conclude that the EPA Order failed to acknowledge its disparate treatment of the same term in its two appearances in the Rule, and thus failed entirely to address an important aspect of the problem. Accordingly, the Order cannot survive the arbitrary and capricious standard of review.

We grant the petition for review, vacate the EPA Order, and remand to the agency for further consideration.

PETITION GRANTED; VACATED and REMANDED.