[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 26, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-10714

_____

EPA No. 4911-149-0006-V-01-0

SIERRA CLUB,

Petitioner,

versus

ADMINISTRATOR, U.S. E.P.A.
U.S. ENVIRONMENTAL PROTECTION AGENCY

Respondent,

OGLETHORPE POWER CORPORATION,
GEORGIA ENVIRONMENTAL PROTECTION DIVISION,
GEORGIA POWER COMPANY,

Intervenor-Respondents.

_____

Petition for Review of a Decision of the
Environmental Protection Agency

_____

**(June 26, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,[*] Judge.

_____

[*] Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

PER CURIAM:

The Sierra Club petitions this Court for the second time to review an order of the Environmental Protection Agency ("EPA") in which the EPA declined to object to a permit granted to Oglethorpe Power Corporation by the Georgia Environmental Protection Division ("Georgia EPD") for the operation and construction of a major stationary source.[1] The question we face today is whether the EPA's interpretation of the term "owner . . . of . . . [a] major stationary source[]," Ga. Comp. R. & Regs. 391-3-1-.03(8)(c); 42 U.S.C. § 7503(a)(3), should be given deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), or whether the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, requires us to invalidate the EPA's order as being arbitrary, capricious, or manifestly contrary to law. After thorough review and oral argument, we accord Chevron deference to the EPA's decision and affirm its amended order.

## I.

Under the Clean Air Act, power companies are required to obtain a permit for the construction of a new or modified major stationary source, 42 U.S.C. § 7502(c)(5) ("preconstruction permit") and for the operation of a major stationary

---

[1] A motion to intervene filed by the Oglethorpe Power Company, the Georgia Environmental Protection Division, and the Georgia Power Company was granted in this case.

source, 42 U.S.C. § 7661a ("Title V permit"). A major stationary source can be either a single power block or unit that emits the threshold level of pollutants, or it can be a group of power blocks or units, located within a contiguous area and under common control, that, in the aggregate, exceeds the statutory level of pollutants.[2] To obtain a permit, the Georgia Statewide Compliance Rule ("Georgia Rule") additionally requires that owners or operators of proposed new or modified "major stationary sources" demonstrate that any existing "major stationary sources" they own or operate are in compliance with the CAA. Ga. Comp. R. & Regs. 391-3-1-.03(8)(c); see also 42 U.S.C. § 7503(a)(3).

In July 2000, the Georgia Power Company received a combined preconstruction and Title V permit for the construction of new facilities at Blocks 6, 7, 8, and 9 at Plant Wansley, a power plant in Heard County, Georgia. At the time, Georgia Power owned and operated these four units. Georgia Power subsequently sold Block 8 to Oglethorpe Power. On November 30, 2000, Oglethorpe applied to the Georgia EPD for a preconstruction and Title V operating

---

[2] Title V of the CAA defines a major stationary source as "any stationary source (or any group of stationary sources located within a contiguous area and under common control)" that (1) "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants" or (2) "emits, or has the potential to emit, one hundred tons per year or more of any air pollutant." 42 U.S.C. § 7661(2) (incorporating 42 U.S.C. § 7412(a)(1) (CAA § 112); 42 U.S.C. § 7602(j) (CAA § 302 or part D of Title I)). Georgia Rule 391-3-1-.03(8)(c)(15)(i) echoes the CAA definition of "major source."

3

permit for Block 8, a major stationary source that later became known as the Wansley Combined Cycle Energy Facility ("Wansley Block 8").

The Sierra Club objected, in pertinent part, on the grounds that Oglethorpe is a part owner of another major stationary source, Plant Scherer, that is not compliant with the CAA and therefore in violation of the Georgia Rule. Plant Scherer consists of four steam electric generating units that are located on contiguous property, are operated by one company (Georgia Power Company), and share one Title V permit. Oglethorpe owns a sixty percent interest in Units 1 and 2 of Plant Scherer, which are CAA-compliant. The two units that are not CAA-compliant -- Units 3 and 4 -- are neither owned nor operated by Oglethorpe. Thus, the issue confronted by the Georgia EPD, and subsequently by the EPA, was whether to deem Oglethorpe an owner of a noncompliant major stationary source when it had part ownership of two CAA-compliant units in a major stationary source.

On January 15, 2002, the Georgia EPD granted the permit to Oglethorpe, over Sierra Club's objection, for construction at Wansley Block 8. Sierra Club then petitioned the EPA to object to the Georgia EPD's decision. See 42 U.S.C. § 7661d(b)(2) ("If the Administrator does not object in writing to the issuance of a permit . . . any person may petition the Administrator . . . to take such action."). In a final order in November 2002, the EPA declined to object. The Sierra Club

4

subsequently appealed directly to this Court in Sierra Club v. Leavitt, 368 F.3d 1300 (11th Cir. 2004) (hereinafter "Sierra Club I"), as provided by 42 U.S.C. §§ 7607(b) and 7661d(b)(2).

In Sierra Club I, a panel of this Court vacated and remanded the EPA's Order for further consideration after determining that the EPA acted arbitrarily and capriciously by failing to provide an adequate explanation for its decision. See Sierra Club I, 368 F.3d at 1304. Upon remand, the EPA issued an amended order, again denying Sierra Club's petition to object. The Sierra Club's second appeal in this case then followed.[3]

---

[3] As a threshold matter, the EPA argues that the Sierra Club does not have standing to bring its claim. The constitutional requirements of standing are that "[1] the plaintiff must have suffered an 'injury in fact' . . . . [2] there must be a causal connection between the injury and the conduct complained of . . . . and [3] it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations omitted). The EPA concedes that the Sierra Club has satisfied the first two constitutional standing requirements by showing injury in fact and causation, but it contends that the Sierra Club fails on the third requirement of redressability. Specifically, the EPA argues that this Court cannot redress Sierra Club's alleged injury from the pollution emitted by Plant Scherer because the only final agency action before this Court is the EPA's denial of Sierra Club's petition to object to the permit at Wansley Block 8. We conclude that the Sierra Club does have standing because it has shown a concrete injury that is fairly traceable to the EPA's actions, and a decision by this Court to remand to the EPA to reconsider the petition to object would be sufficient to establish redressability for the purposes of agency action. See FEC v. Akins, 524 U.S. 11, 26 (1998) ("[T]hose adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground."). This is especially true in light of the fact that the Clean Air Act gives "any person" the authority to bring a civil action on his or her own behalf "against any person . . . who is alleged to have violated . . . an emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1). An "emission standard or limitation" is defined to include "any other standard, limitation, or schedule established under any permit issued pursuant to [Title V] or under any applicable State implementation plan approved by the [EPA] Administrator." 42 U.S.C. § 7604(f)(4). Accordingly, citizens may sue to enforce the terms of a stationary source's Title V permit, and the Sierra Club has both statutory and constitutional standing here.

**II.**

In Sierra Club I, we did not ultimately determine whether Chevron deference should be given to the EPA Order. Sierra Club I, 368 F.3d at 1304 n.9 ("We note that it is unclear whether Chevron deference applies to EPA's interpretation of the Georgia Rule because the Rule is a state regulation which EPA is not specifically charged with administering and enforcing."). Today we answer that question in the affirmative. The fact that the Georgia Rule is a state regulation is not an obstacle to according Chevron deference in this case because the Georgia Rule is part of a state implementation plan ("SIP") made pursuant to the CAA, and therefore "ha[s] the force and effect of federal law and may be enforced by the [EPA] in federal courts." Union Elec. Co. v. EPA, 515 F.2d 206, 211 (8th Cir. 1975), aff'd, 427 U.S. 246 (1976); see also Safe Air for Everyone v. EPA, 475 F.3d 1096, 1099 (9th Cir. 2007). Indeed, since the Georgia Rule tracks the language of the CAA so closely, the CAA provides the EPA with the authority to object to state decisions to grant permits, 42 U.S.C. § 7661d(b), and there is no indication here that the Georgia EPD interprets its own Statewide Compliance Rule differently than the EPA, see Am. Cyanamid Co. v. EPA, 810 F.2d 493, 498 (5th Cir. 1987) (granting Chevron deference to the EPA's interpretation of a Louisiana SIP even though it

6

conflicted with the state's interpretation of its own regulation), it is altogether appropriate to grant Chevron deference to the EPA's amended order.

Under Chevron deference, we must accept an agency's reasonable interpretation of an ambiguous statute, "even if the agency's reading differs from what the court believes is the best statutory interpretation." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (citing Chevron, 467 U.S. at 843-44 & n. 11). Chevron analysis of an agency's decision proceeds in two steps. In the first step, we ask whether the statute's plain terms "directly address[] the precise question at issue." Chevron, 467 U.S. at 843. In the second step, we are obliged to assess "whether the agency's answer is based on a permissible construction of the statute." Id.

The Georgia Rule, which the EPA interpreted in its amended order, provides:

> [N]o permit to construct a new or modified major stationary source . . . shall be issued unless . . . [t]he owner or operator of the proposed new or modified source has demonstrated that all major stationary sources owned or operated by such person (or by an entity controlling, controlled by, or under common control with such person) in this State, are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under the Act[.]

Ga. Comp. R. & Regs. 391-3-1-.03(8)(c).

7

Beginning with <u>Chevron</u>'s first step, nothing in the statutory language of the CAA or the Georgia Rule answers the question of how the EPA should define the phrase "owner . . . of . . . [a] major stationary source[]" for purposes of evaluating whether Oglethorpe should be denied a preconstruction and operating permit. The CAA does provide definitions of both an "owner or operator"[4] and a "major stationary source,"[5] but reading the two phrases together plainly creates the ambiguity that underlies the central issue of this case. The CAA and the Georgia Rule do not speak in terms of ownership or operation of <u>individual sources</u> in a major stationary source. Instead, the language of these regulations refers, in a monolithic sense, to owning or operating a major stationary source. Indeed, in <u>Sierra Club I</u>, we found that the Georgia Rule was ambiguous regarding that term. <u>Sierra Club I</u>, 368 F.3d at 1304. "The problem in this case is that Oglethorpe owns <u>part</u> of a noncompliant major stationary source, <u>i.e.</u>, Plant Sherer [sic], and the Rule is unclear regarding such situations." <u>Id.</u> (emphasis in original). Our best reading of the CAA and the Georgia Rule <u>in pari materia</u> yields the conclusion that neither Congress nor the Georgia legislature has spoken directly to the question of whether

---

[4] The CAA defines "owner or operator," somewhat tautologically, as "any person who owns, leases, operates, controls, or supervises a stationary source." 42 U.S.C. § 7412(a)(9).

[5] <u>See</u> note 2, <u>supra</u>.

8

a partial owner of a unit <u>within</u> a major stationary source should be considered an owner of the major stationary source as a whole for permitting purposes.

Having concluded that the statutory language is unclear, we necessarily proceed to the second step to determine whether the agency's interpretation is a reasonable one. <u>Chevron</u>, 467 U.S. at 844 (a court must not give controlling weight to an agency interpretation that is "arbitrary, capricious, or manifestly contrary to the statute"). Again, the Georgia Rule requires:

> [N]o permit to construct a new or modified <u>major stationary source</u> . . . shall be issued unless . . . [t]he owner or operator of the proposed new or modified source has demonstrated that all <u>major stationary sources</u> owned or operated by such person (or by an entity controlling, controlled by, or under common control with such person) in this State, are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under the Act[.]

Ga. Comp. R. & Regs. 391-3-1-.03(8)(c) (emphases added). The Georgia Rule thus uses the term "major stationary source" twice: in the first instance to refer to a permit for a new or modified major stationary source, and in the second to establish a compliance requirement barring the owner of a noncompliant major stationary source from obtaining such a permit.

In <u>Sierra Club I</u>, we observed that the EPA's first order, without <u>any</u> explanation, had seemingly given the term "major stationary source" two different definitions in the permitting and compliance contexts. For the purposes of a

9

preconstruction permit, we took the EPA to be saying that a "major stationary source" is "an aggregation of contiguous air pollution sources which collectively emit certain levels of pollution." Sierra Club I, 368 F.3d at 1302 n.1 (emphasis added); see also 42 U.S.C. § 7661(2). In the context of compliance, however, we observed that "the agency appears to have determined that the Georgia Rule allows breaking major stationary sources into constituent parts with compliance determined individually." Sierra Club I, 368 F.3d at 1305-06 (emphasis added).

After we remanded to the EPA to provide adequate explanation for its ostensibly divergent definitions of the same phrase in a single regulation, the EPA's amended order presents a credible and altogether reasonable explanation that it is actually treating the term "major stationary source" the same way for both permitting and compliance purposes. In both contexts, the EPA says, it is looking at individual sources. In the permitting context, Oglethorpe owns and operates Block 8, an individual source at Plant Wansley, and it is accordingly applying for one preconstruction and Title V permit for that source. On the compliance end, Oglethorpe owns Units 1 and 2 at Plant Scherer, and the EPA is likewise evaluating only those individual sources over which Oglethorpe exercises control.

Thus, the EPA says, this individual source definition at Plant Scherer would not include Units 3 and 4, since Oglethorpe neither owns nor operates these units.[6]

But even if the EPA has construed the term "major stationary source" differently in the permitting and compliance contexts, we cannot conclude that its reasons for doing so were unreasonable. See EPA Amended Order at 7-8. Aggregating units makes sense in the context of permitting precisely because companies should not be able to evade EPA compliance requirements just by subdividing major stationary sources into units too small to meet individually the EPA threshold for major stationary source compliance. See id. In the context of compliance, however, the EPA argues that the policy rationale is different. There, the goal is to ensure that all the sources owned or operated by an entity are in compliance with the CAA before such an entity can build or modify other sources. See EPA Amended Order at 8. Thus, the focus is on whether an entity seeking a permit for a new source can control the pollution being emitted by existing sources it owns or operates. See id. In this case, Oglethorpe has neither an ownership interest in nor operational control over Georgia Power for Units 3 and 4 at Plant

_____

[6] Notably, in a compliance action the EPA brought against Georgia Power at Plant Scherer for noncompliant Units 3 and 4, the EPA did not name Oglethorpe Power in its complaint. The fact that the EPA only named Georgia Power with respect to these noncompliant units suggests that the EPA is consistently interpreting compliance only with regard to the owner or operator of specific noncompliant units -- not every owner affiliated with a unit in a major stationary source.

11

Scherer. Simply put, Oglethorpe cannot command Georgia Power to put Units 3 and 4 -- units that Oglethorpe does not own <u>or</u> operate -- into compliance status.

Thus, it does not appear to us to be unreasonable for the EPA to have looked only to the owner or operator of a <u>specific</u> noncompliant unit in a major stationary source when deciding whether a company should receive a permit under the Georgia Statewide Compliance Rule. <u>See</u> EPA Amended Order at 8 ("EPA does not believe that the Georgia Statewide Compliance Rule's purpose would be served if the applicant were penalized for violations at sources where it does not have the power to correct the violations."). Indeed, "[i]f the agency's interpretation is reasonable, a reviewing court may not substitute its own construction of the statutory provision for that of the agency. An agency's reasonable statutory interpretation must therefore stand even in the face of other permissible interpretations, including that which the court may have chosen had the question initially arisen in a judicial proceeding." <u>Legal Envtl. Assistance Found. v. EPA</u>, 276 F.3d 1253, 1258 (11th Cir. 2001) (citations omitted).

In short, the term "owner . . . of . . . [a] major stationary source[]" is ambiguous, and the EPA's interpretation is not "arbitrary, capricious, or manifestly contrary to the statute." We are thus obliged to uphold the EPA's decision not to object to Oglethorpe's Title V permit.

**AFFIRMED.**

12