Randy BIBBO, Plaintiff–Appellant,

v.

DEAN WITTER REYNOLDS, INC.,
Defendant–Appellee.

No. 97–3538.

United States Court of Appeals,
Sixth Circuit.

Argued April 24, 1998.

Decided Aug. 5, 1998.

Robert M. Andersen (argued), Edward W. Cochran (briefed), Cochran & Cochran, Shaker Heights, Ohio, for Plaintiff–Appellant.

Richard A. Rosen (briefed), Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Marvin L. Karp (argued and briefed), Michael N. Ungar (briefed), Ulmer & Berne, Cleveland, Ohio, for Defendant–Appellee.

Dennis A. Klejna (briefed), Tegan M. Flynn, Vinson & Elkins, Washington, DC, for Amicus Curiae.

Before: BATCHELDER and COLE, Circuit Judges; McCALLA, District Judge.*

_____

* The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennes-     see, sitting by designation.

COLE, Circuit Judge.

Plaintiff Randy Bibbo appeals the decision of the district court granting Defendant Dean Witter's motion to dismiss Bibbo's complaint pursuant to Fed.R.Civ.P. 12(b)(6). Bibbo brought an action against Dean Witter, alleging that Dean Witter violated Ohio law when it retained interest earned from its investment of Bibbo's money (referred to as "margin money" or "margin funds"), which was kept on deposit with Dean Witter as a partial guarantee that Bibbo would meet certain obligations under an investment contract. On appeal, we must determine whether a federal regulation, 17 C.F.R. § 1.29 (1986) ("Regulation 1.29"), which permits a Futures Commodities Merchant ("FCM") such as Dean Witter to retain interest earned on customers' margin funds, pre-empts an Ohio statutory provision, O.R.C. § 1309.18 (1996), which requires payment to debtors of any profits earned from collateral held by a secured party. The district court concluded that O.R.C. § 1309.18 is pre-empted by federal law and dismissed Bibbo's complaint. For the following reasons, we **AFFIRM** the judgment of the district court.

## I.

Bibbo was a customer of Dean Witter, a large licensed securities broker and dealer, which maintained a commodities futures account on his behalf. With this account, Bibbo could enter into investment contracts for the purchase or sale of commodities for future delivery ("futures") as a way of speculating on changes in the price of various commodities.[1]

### A.

As the facts of this case arise out of the complex world of futures trading, we begin with a brief mention of the background of that industry. Futures trading is conducted on exchanges designated as contract markets by the Commodities Futures Trading Commission ("CFTC"), an independent agency created by Congress in 1974 to exercise exclusive jurisdiction over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market. Commodities Futures Trading Commission Act of 1974, 7 U.S.C. § 2 (1996) (amending Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 et seq. (1996)). Futures trades are executed on a customer's behalf by an FCM, such as Dean Witter.

When a customer enters into a futures transaction with an FCM, the customer must deposit a certain amount of margin money with the FCM to cover any losses that the customer may incur by virtue of a change in the price of the commodity. Margin money is similar to a performance bond or earnest money, and is required to ensure that the customer will meet his or her financial obligation under the terms of the futures contract.[2] After the investor deposits margin money with the FCM, the FCM is then required to deposit that money with the clearing organization to secure the investor's futures position. Depending on fluctuations in the price of the futures contracts, the investor may be required to deposit additional margin money or may be permitted to withdraw funds from the margin account.

### B.

Upon opening his account, Bibbo signed Dean Witter's standardized form contract entitled "Commodity Customer Agreement" (the "Agreement"), which stated in § 1 that:

In all transactions, [Bibbo] shall be bound by all applicable laws, rules and regulations, including the Commodity Exchange Act, as amended, the regulations then obtaining of the Commodities Future Trad-

---

1. However, in futures trading, an investor such as Bibbo rarely takes actual delivery of the commodity; instead, an investor seeks to profit from favorable price changes by entering into "offsetting" contracts before the delivery date, thereby liquidating his or her obligations.

2. Margin money also serves to protect the broker because exchange rules require the FCM to bear any trading losses not honored by its customers. *See Craig v. Refco, Inc.,* 624 F.Supp. 944, 944–45 (N.D.Ill.1985), *aff'd,* 816 F.2d 347 (7th Cir.1987) (per curiam). In fact, the very nature of these executory contracts means that there is a genuine risk that when the contract becomes due the buyer or seller will default. *See id.*

ing Commission ("CFTC"), and the constitution, rules, regulations, customs, usages, rulings and interpretations then obtaining of the National Futures Association ("NFA") and the exchange or market and clearing house, if any, where transactions are executed.

Bibbo opted out of a mandatory arbitration clause, but assented to the remaining terms of the Agreement. In § 2 of the Agreement, Bibbo specifically agreed "to maintain original and variation margin, as required by [Dean Witter] at its sole discretion from time to time, in any and all accounts [Bibbo] may at any time carry with Dean Witter." Section 1 of the Agreement incorporated the CFTC's Regulation 1.29. Under the authority of Regulation 1.29, Dean Witter retained the interest earned on Bibbo's margin money, which has been its standard practice with all its customers.

Bibbo filed this action against Dean Witter in state court alleging that Dean Witter's retention of interest earned from its investment of his (and other customers')[3] margin money violated O.R.C. § 1309.18, which requires secured parties to apply the interest earned by collateral to reduce their debtor's secured obligations.[4] The action was subsequently removed to federal court based on diversity jurisdiction.

Thereafter, Dean Witter moved to dismiss Bibbo's complaint pursuant to Fed.R.Civ.P. 12(b)(6). In its motion to dismiss, Dean Witter maintained that: (1) Bibbo's state law claim under O.R.C. § 1309.18 is pre-empted by Regulation 1.29; and (2) O.R.C. § 1309.18 does not apply to the conduct of which Bibbo complains. On May 13, 1997, the district court granted Dean Witter's motion based on pre-emption grounds, without reaching the issue of whether O.R.C. § 1309.18 actually applies in this case. This timely appeal followed.

## II.

A district court's decision to dismiss a complaint pursuant to Fed.R.Civ.P. 12(b)(6) is a question of law, which we review de novo. *See Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir.1996). We must construe the complaint in a light most favorable to the plaintiff, accept his or her factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *See id.*

## III.

The sole issue presented by this appeal is whether Regulation 1.29, which allows an FCM to retain interest earned on a customer's margin account, pre-empts O.R.C. § 1309.18 to the extent it may be read to require payment of such interest by the FCM to the customer.[5]

### A.

Bibbo contends that Dean Witter's retention of interest earned on his deposited margin money is in violation of O.R.C. § 1309.18, which provides that "[u]nless the parties otherwise agreed, when collateral is in the secured party's possession ... the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obli-

---

**3.** In his complaint, Bibbo sought certification of a class comprised of all Dean Witter's customers who have been denied interest earned on their margin money. However, the district court granted Dean Witter's 12(b)(6) motion dismissing Bibbo's complaint before it decided whether to certify the proposed class.

**4.** The text of O.R.C. § 1309.18, which is based on U.C.C. § 9–207, reads as follows:

Unless otherwise agreed, when collateral is in the secured party's possession:

(3) the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation[.]

**5.** In deciding that federal law pre-empted the Ohio statute, the district court assumed *arguendo* that O.R.C. § 1309.18 applies to interest earned on margin money. We need not resolve whether O.R.C. § 1309.18 actually applies in this transaction because we hold that the Ohio statute is pre-empted if it does govern such interest earned on Bibbo's margin money.

gation...." Assuming *arguendo* that O.R.C. § 1309.18 and its statutorily defined terms actually apply to Bibbo's margin money account, the margin funds deposited with Dean Witter on Bibbo's behalf would be considered "collateral," as defined in O.R.C. § 1309.01 (" 'Collateral' means the property subject to a security interest, and includes accounts and chattel paper which have been sold."), with Dean Witter taking, by contract, a "security interest" in that collateral. Accordingly, if O.R.C. § 1309.18 applies, then any interest or profits received from the investments serving as collateral must be paid to Bibbo (i.e., as the "debtor") or applied in reduction of his secured obligation, unless otherwise agreed by the parties. Therefore, Bibbo contends that Dean Witter violated O.R.C. § 1309.18 by failing to pay him interest earned on his margin money because he never agreed to allow Dean Witter to retain such interest.

In contrast, Dean Witter argues that Regulation 1.29 pre-empts O.R.C. § 1309.18 and allows it to retain any interest earned on Bibbo's margin money because that regulation's express language permits FCMs investing customer margin funds to retain any resulting interest earned on those monies. Regulation 1.29 provides that "[t]he investment of customer funds in obligations described in § 1.25 shall not prevent the futures commission merchant or clearing organization so investing such funds from receiving and retaining as its own any increment or interest resulting therefrom." [6] 17 C.F.R. § 1.29.

**B.**

The pre-emption doctrine arises out of the Supremacy Clause of Article VI of the United States Constitution, which dictates that federal law is the supreme law of the land. *See Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). In order to determine if federal law pre-empts a state law, we must determine whether Congress intended the statute at issue to have such a pre-emptive effect.

■ It is well-established that three types of federal pre-emption exist, one express and two implied.[7] *See Gustafson v. City of Lake Angelus*, 76 F.3d 778, 782 (6th Cir.1996). Express pre-emption exists when Congress expresses a clear intent to pre-empt state law in the language of the statute. *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). The first type of implied pre-emption, field pre-emption, is implicit where Congress indicates an intent to occupy exclusively an entire field of regulation; we infer that intent, for example, from a federal regulatory scheme that is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *See de la Cuesta*, 458 U.S. at 153, 102 S.Ct. 3014 (internal quotation omitted). The second type of implied pre-emption, conflict pre-

---

**6.** Under federal regulations, an FCM is required to segregate its funds from customer margin money. *See* 7 U.S.C. § 6d(2). Commingling of customer funds with the FCM's funds, or the use of a customer's funds to margin or guarantee the trades or contracts of another customer, is strictly prohibited. *See* 7 U.S.C. § 6d(2). Nevertheless, Congress permits the FCM to invest customer funds in certain government securities in accordance with CFTC regulations. *See* 7 U.S.C. § 6d(2). The CFTC has given effect to Congress' limitation on the investment of customer funds in 17 C.F.R. § 1.25, which provides that "[n]o futures commission merchant and no clearing organization shall invest customer funds except in obligations of the United States, in general obligations of any State or of any political subdivision thereof, or in obligations fully guaranteed as to principal and interest by the United States."

**7.** However, as the Seventh Circuit pointed out in *American Agric. Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1154 (7th Cir.1992), the lines between these three types of pre-emption are not always clear-cut, *see English v. General Elec. Co.*, 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), causing difficulty in applying the doctrine properly. *Compare Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 93–109, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (plurality) (finding conflict pre-emption but no express pre-emption) with *id.* at 109–14, 112 S.Ct. 2374 (Kennedy, J., concurring) (finding express pre-emption but no conflict pre-emption) with *id.* at 114–21, 112 S.Ct. 2374 (Souter, J., dissenting) (finding no pre-emption under all three prongs).

emption, occurs either where it is impossible to comply with both federal and state law, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as reflected in the language, structure and underlying goals of the federal statute at issue. *See id.*

■ In determining whether federal law pre-empts state law, federal regulations have no less pre-emptive effect than federal statutes and do not depend on express congressional authorization to displace state law. *See id.* at 153–54, 102 S.Ct. 3014 (stating that in analyzing the pre-emptive effect of an agency regulation, a narrow focus on Congress' intent to supersede state law is misdirected, as a pre-emptive regulation's force does not depend on express congressional authorization to displace state law). Rather, courts inquire whether the agency intended to pre-empt state law, and, if so, whether the agency possessed the power to do so. *See id.* at 154, 102 S.Ct. 3014.

### C.

The parties do not suggest that the CEA expressly pre-empts state law governing the standardized form contract involved in this transaction, or that Congress has exclusively occupied this field of law (i.e., contracts between FCMs and their customers) through a pervasive scheme of regulation.[8] *See, e.g., id.* at 159 n. 14, 102 S.Ct. 3014 (declining to decide whether the federal statute or regulations at issue occupied the field of applicable law where an actual conflict between state and federal law was found). Thus, we turn to the third possibility, conflict pre-emption, to determine whether it is impossible to comply with both federal and state law, or whether O.R.C. § 1309.18 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA.

■ Here, we do not believe that compliance with both O.R.C. § 1309.18 and Regulation 1.29 is impossible, because Regulation 1.29 *permits* but does not *require* Dean Witter to pay Bibbo any interest earned on his margin money. In other words, Regulation 1.29 allows an FCM to pay to Bibbo any interest earned on his margin money; thus, it is physically possible to comply with both O.R.C. § 1309.18 and Regulation 1.29. Under this third type of pre-emption analysis, however, we also must consider whether O.R.C. § 1309.18 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA. As discussed below, we believe that the statute stands as such an obstacle, and is, therefore, pre-empted.

In an analogous case, the Supreme Court found that a *permissive* federal regulation allowing federally chartered savings and loans to enforce "due-on-sale" clauses in mortgages pre-empted state law *prohibiting* such clauses because California law stood as an obstacle to the federal regulation. *See id.* at 156, 102 S.Ct. 3014. In reaching that conclusion, the Court reasoned that

> [t]he conflict does not evaporate because the Board's regulation simply *permits*, but does not *compel*, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred.... Although compliance with both [the federal regulation and state law] may not be "a physical impossibility," ... the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely "at its option" and have deprived the lender of the "flexibility" given it by the Board.

*Id.* at 155, 102 S.Ct. 3014 (citations omitted) (emphasis added). Accordingly, the Court concluded that California law was pre-empted. *Id.* at 156, 102 S.Ct. 3014 (reasoning that

---

8. Although the parties do not raise either of the other two pre-emption arguments, the Futures Industry Association does argue, in its *amicus* brief, that Congress' intent was to give the CFTC exclusive jurisdiction over the futures industry to prevent state regulation. However, as this case is easily resolved on conflict pre-emption grounds, we need not address the question of whether Congress intended the CFTC to have exclusive jurisdiction over the transaction at issue.

state law stood as an obstacle by "further limiting the availability of an option the Board consider[ed] essential to the economic soundness of the thrift industry").

Here, based on the same reasoning adopted by the Court, we believe that O.R.C. § 1309.18 also fails the obstacle test. A direct conflict exists between Regulation 1.29 and O.R.C. § 1309.18 because the latter deprives FCMs of a valuable benefit granted them in Regulation 1.29: a presumption that FCMs are permitted to retain interest earned on their customers' margin money absent a contrary agreement between the parties.[9] *See also Owensboro Nat'l Bank v. Stephens,* 44 F.3d 388, 390–91 (6th Cir.1994) (concluding that a Kentucky statute prohibiting any person owning more than half of the capital stock of a bank from acting as an insurance agent or broker stood as an obstacle to, and was, therefore, pre-empted by, a federal statute permitting national banks operating in towns with fewer than 5000 persons to act as insurance agents). Assuming *arguendo* that O.R.C. § 1309.18 applies, § 1309.18 grants Bibbo the option to veto Dean Witter's presumptive right to retain any interest earned on Bibbo's margin money; in other words, Dean Witter would only be able to retain Bibbo's interest if Bibbo contractually agreed to its doing so. Because O.R.C. § 1309.18 eliminates Regulation 1.29's presumption that Dean Witter may retain any interest earned on Bibbo's margin money, we conclude that it impedes the flexibility the CFTC provided to FCMs like Dean Witter to decide whether to allow its customers to retain the interest earned from the investment of margin funds.

Our reading comports with the legislative history of the CEA. *See Marchese v. Shearson Hayden Stone, Inc.,* 644 F.Supp. 1381, 1388–89 (C.D.Cal.1986), *aff'd,* 822 F.2d 876 (9th Cir.1987) (explaining that the legislative history of the CEA indicates that Congress intended to permit FCMs to retain interest earned on customers' margin money); *see*

*also Craig,* 624 F.Supp., at 947 (reasoning that retention by the FCM of interest earned on margin money is appropriate because the FCM bears the risk of any decline in the value of an obligation purchased with a customer's margin funds). Against this backdrop, the CFTC promulgated Regulation 1.29 to allow FCMs like Dean Witter, who bear the risk of any decline in the value of investments purchased with customer funds, to retain the profits received on investments of customer margin money in a limited category of permissible investments. *See Craig,* 624 F.Supp. at 947.

### CONCLUSION

For the reasons stated above, we hold that O.R.C. § 1309.18 directly conflicts with Regulation 1.29 and is, therefore, pre-empted by federal law. Therefore, because Bibbo can prove no set of facts in support of his claims that would entitle him to relief, the district court properly dismissed Bibbo's complaint pursuant to Fed.R.Civ.P. 12(b)(6). Accordingly, we **AFFIRM** the district court's judgment.

---

**9.** Although Regulation 1.29 permits Dean Witter and Bibbo to agree that any interest earned on margin money will go to Bibbo, the parties did not choose to do so here. As the Seventh Circuit noted in *Craig:* "The parties could have agreed that any such interest would go to [the custom-

er]. People with sufficient financial savvy to invest in such speculative things as commodities futures should be able to understand such contractual provisions and, if they do not like them, negotiate something different." 816 F.2d at 348.