**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 5, 2009

Charles R. Fulbruge III
Clerk

No. 08-30601

In the Matter of:
JOSEPH L. MILLER, II;  SHELLEY L. MILLER,

Debtors.

DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC,

Appellant,

versus

JOSEPH L. MILLER, II;  SHELLY L. MILLER;  KEITH A. RODRIGUEZ,

Appellees.

Appeal from the United States Bankruptcy Court
for the Western District of Louisiana
No. 07-20542

Before SMITH, GARZA, and CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Joseph Miller ("Miller") and his wife, Shelley Miller, filed a chapter 13

bankruptcy petition and proposed to surrender their vehicle in full satisfaction of the remaining debt to DaimlerChrysler ("DC"), which opposed the bankruptcy plan. The bankruptcy court confirmed the plan, and DC appealed directly to this court. We reverse and remand.

## I.

Miller entered into a contract with a dealership for the purchase of a vehicle. The dealership assigned all its interests in the contract to DC, which perfected its lien on the vehicle with a first priority purchase money security interest ("PMSI"). Later, Miller filed a voluntary petition for chapter 13 bankruptcy.[1] DC filed a timely proof of a secured claim for $34,050.98, the outstanding payoff balance due at the petition date.

Miller filed an amended chapter 13 plan in which he proposed to surrender the vehicle in full satisfaction of his debt pursuant to 11 U.S.C. § 1325(a)(5)(C). DC objected to the plan, noting that the vehicle was worth less than Miller's remaining debt. The bankruptcy court affirmed the plan, holding that the addition of the "hanging paragraph"[2] to the Bankruptcy Code (the "Code") by the Bankruptcy Abuse Prevention and Consumer Act of 2005 ("BAPCPA") allowed Miller to surrender the vehicle in full satisfaction of the debt. We granted DC's request for leave to take a direct appeal from the bankruptcy court to this court. *See* 11 U.S.C. § 158(d)(2)(A).

## II.

The issue is whether the hanging paragraph prevents a creditor with a PMSI in what is termed a "910 vehicle" from obtaining a state law deficiency

---

[1] Miller filed this petition within 910 days of the initial contract's signing.

[2] The hanging paragraph is "an unnumbered paragraph following section 1325(a)(9)" of the Bankruptcy Code. *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008).

judgment against a debtor for the portion of the debt not covered by the sale of the surrendered vehicle under 11 U.S.C. § 1325(a)(5)(C). It does not.

## A.

Before BAPCPA was enacted, a bankruptcy court could confirm a chapter 13 plan in one of three ways: (1) The debtor and creditor agreed on a plan; (2) the debtor retained the collateral and continued to make payments;[3] or (3) the debtor surrendered the collateral.[4] *Tidewater Fin. Co. v. Kenney*, 531

---

[3] This was known as the "cramdown." *See generally* Todd J. Zywicki, *Cramdown & the Code*, 19 T. Marshall L. Rev. 241 (1994), *cited in Assocs. Commercial Corp. v. Rash (In re Rash)*, 90 F.3d 1036, 1066 (5th Cir. 1996) (en banc) (Smith, J., dissenting), *rev'd*, 520 U.S. 953 (1997).

[4] The pertinent language reads as follows:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;

. . .

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that—

(I) the holder of such claim retain the lien securing such claim until the earlier of—

(aa) the payment of the underlying debt determined under nonbankruptcy law; or

(continued...)

F.3d 312, 316 (4th Cir. 2008).  If the debtor chose the third option, "the creditor could pursue an unsecured deficiency claim if it had a right to collect a deficiency under applicable nonbankruptcy law." *DaimlerChrysler Fin. Servs. Am. LLC v. Barrett  (In re Barrett)*, 543 F.3d 1239, 1242 (11th Cir. 2008).  That deficiency is considered an unsecured claim under 11 U.S.C. § 506(a)(1), which reads:

> An allowed claim of a creditor secured by a lien on property

---

[4] (...continued)

> > > (bb) discharge under
> > > section 1328; and

> > (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;

> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

> (iii) if—

> > (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

> > (II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

> (C) the debtor surrenders the property securing such claim to such holder . . . .

11 U.S.C. § 1325 (2000).  This language was not changed by the BAPCPA.

. . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.

BAPCPA changed that statutory analysis by adding the hanging paragraph, which states that § 506 does not apply to § 1325(a)(5) if

the creditor has a [PMSI] securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor . . . .

11 U.S.C. § 1325(a)(*).[5] "The hanging paragraph prevents [§ 506's] bifurcation for secured claims that meet its criteria." *Drive Fin. Servs.*, 521 F.3d at 347. Miller and DC agree that this case is covered by the hanging paragraph, because the vehicle qualifies as a "910 vehicle"––meaning that Miller purchased it within 910 days of his bankruptcy filing––and it was for his personal use.[6] We must decide what happens now that § 506 no longer applies to § 1325(a)(5).

Numerous courts have examined this issue, but with widely divergent results. Traditionally, their outcomes have fallen into the "majority view" and "minority view" camps. The majority view holds that a debtor can surrender a 910 vehicle in full satisfaction of his debt regardless of whether the car was worth less than the total amount of debt. *See, e.g., In re Payne*, 347 B.R. 278, 283-84 (Bankr. S.D. Ohio 2006); *In re Ezell*, 338 B.R. 330, 340 (Bankr. E.D. Tenn. 2006).

---

[5] Because the hanging paragraph is unnumbered, it is difficult to cite. We use the asterisk that many courts have employed. *See, e.g., In re Barrett*, 543 F.3d 1239, 1243 (11th Cir. 2008); *In re Smith*, No. 07-30201, 2007 WL 1577668, at *1 & n.2 (Bankr. S.D. Tex. May 29, 2007).

[6] We take no position in this opinion regarding what constitutes personal use. *See, e.g., In re Smith*, 2007 WL 1577668, at *2-*3 (discussing that debate).

The minority view opines that a creditor can still pursue any remaining debt on a 910 vehicle under state law, regardless of the elimination of § 506. *See, e.g., In re Particka,* 355 B.R. 616, 625-28 (Bankr. E.D. Mich. 2006).

The "majority" and "minority" labels, however, no longer accurately describe the current state of the jurisprudence. The majority view, although at one time dominant,[7] has been rejected by every circuit court of appeals that has examined the question.[8] If anything, the majority view has now become the minority position, applied only in bankruptcy courts whose circuits have yet to address the issue.[9] Thus, instead of using outdated labels, we discuss the earlier cases in terms of the "full-satisfaction position" (the old majority view) and the "deficiency position" (the old minority view).

## B.

Miller and *amicus curiae* the National Association of Consumer Bankruptcy Attorneys ("NACBA") propose we follow the full-satisfaction position reflected in decisions such as *Ezell* and *In re Pinti*, 363 B.R. 369 (Bankr. S.D.N.Y. 2007). DC proposes we follow the deficiency position and provides us with two models to reach that result: (1) the "equity-of-the-statute" approach of *AmeriCredit Financial Services, Inc. v. Long (In re Long)*, 519 F.3d 288 (6th Cir. 2008); and (2) using state law as in *Wright v. Santander Consumer USA Inc. (In re Wright)*, 492 F.3d 829 (7th Cir. 2007).[10]

---

[7] *See Particka*, 355 B.R. at 625 ("The Court recognizes that [as of November 2006] the weight of authority is in favor of the [majority] position.").

[8] *See Barrett*, 543 F.3d at 1243-47 (describing the position taken by all circuits that have decided the question and agreeing with their results).

[9] *See id.* at 1246 ("[I]t seems safe to say that the previous minority view is now the majority view.").

[10] The deficiency position was reached on yet another ground in *Wells Fargo Financial*
(continued...)

1.

We disagree with the "equity-of-the-statute" reasoning in *Long*, because, even though that court reached the right result, the reasoning violates our long-standing standards for analyzing statutes. The court focused heavily on a bankruptcy treatise and on the "sparse" legislative history surrounding the hanging paragraph. *See Long*, 519 F.3d at 293-95. The court acknowledged that earlier decisions and its bankruptcy treatise said that the full-satisfaction position complied with the plain-text reading of the Code, but the court disagreed with their result. *Id*. at 295. Instead, it found that there was a "gap" in the statute and that reading it literally would "produce a nonsensical result not intended by the drafters" of BAPCPA. *Id*.

The *Long* court considered the state-law solution proposed in *Wright* (which we discuss below) but rejected it because it "fails even to consider that a primary, underlying purpose of the Bankruptcy Code is to provide a uniform, nationwide system by which claims are handled." *Id*. at 296. The court insisted that relying on state law would "undermine the uniformity the Code endeavors to preserve." *Id*. at 297 (quoting *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562-63 (6th Cir. 1998)).

Instead of using state law, the court in *Long* determined that its decision regarding the hanging paragraph "should be filled by prior [bankruptcy] law" to "conform with Congress' intent and the overriding purposes of the Bankruptcy Code." *Id*. To return to the pre-BAPCPA Code, the court employed the "well-established common law principle of interpretation known as 'the equity of the statute.'" *Id*. That notion "connotes the idea that 'statutes are an authoritative

---

[10] (...continued)
*Acceptance v. Rodriguez (In re Rodriguez)*, 375 B.R. 535, 543-45 (B.A.P. 9th Cir. 2007), but because neither party advocates that position, and we ultimately disagree with its reasoning, we decline to adopt it.

expression of public policy. That policy should be hospitably received by the courts, and they are free to apply it, absent good reasons to the contrary, in cases within the spirit of the enactment, but not within its letter.'" *Id.* at 298 (quoting *North Dakota v. Fredericks*, 940 F.2d 333, 337 (8th Cir. 1991)).

The reasoning in *Long* is flawed. When interpreting the Code, courts should begin where they would when interpreting any statute: its plain language. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). If the statute is clear, the inquiry is at its end, and we enforce the statute on its terms. *See id.* That rule should inform the reading of Code provisions and likewise governs our treatment of the hanging paragraph.

In *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004), the Court emphasized that the plain language meaning of the Code should rarely be trumped. Although the Code at times is "awkward, and even ungrammatical . . . that does not make it ambiguous." *Id.* When presented with an argument that the Code would make more sense by "read[ing] an absent word into the statute," the Court rejected the idea, stating that "[w]ith a plain, nonabsurd meaning in view, we need not proceed in this way." *Id.* at 538.

"There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *Id.* (citation and internal quotation marks omitted). "If Congress enacted into law something different from what it intended, then it should amend the statute to conform to its intent. 'It is beyond our providence to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result." *Id.* at 542 (quoting *United States v. Granderson*, 511 U.S. 39, 68 (Kennedy, J., concurring) (ellipses in original)).

BAPCPA has been criticized by some judges and commentators as being "poorly drafted" and has resulted in certain readings of the Code that would

qualify as "awkward" under the definition in *Lamie*.[11] Although we have no reason to pass judgment on the process by which BAPCPA became law, we note that perceived poor drafting should not be regarded as a licence to invalidate plain-text readings in the name of fixing a statute that some believe is broken.

Even if we were to seek guidance on BAPCPA from somewhere outside its plain language, we would be stopped by a dearth of plain legislative history. Pre-BAPCPA courts recognized the difficulty of finding legislative history to divine congressional intent regarding the Code.[12] That criticism has been even more pronounced since BAPCPA's passage.[13] With no precise legislative history to rely on, we should generally not stray from the language in an attempt to implement "legislative intent."

By relying on the equity-of-the-statute theory, the court in *Long* deviated from the proper reading of the Code. Equity of the statute as a concept has es-

---

[11] *See, e.g., In re Grydzuk*, 353 B.R. 564, 567 (Bankr. N.D. Ind. 2006) (describing 11 U.S.C. § 1328(f)(1) as "another in a long string of incredibly poorly drafted statutory provisions under the BAPCPA"); Thomas F. Waldron & Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 AM. BANKR. L.J. 195, 196 (2007) (discussing the "many poorly drafted provisions" of BAPCPA). The hanging paragraph has been referenced specifically as being poorly drafted. *See, e.g., In re Pinti*, 363 B.R. 369, 377 (Bankr. S.D.N.Y. 2007) ("Although poorly drafted, the Hanging Paragraph is not ambiguous.").

[12] *See, e.g., In re Brady*, 86 B.R. 166, 169 (Bankr. D. Minn. 1988) ("While it is always risky trying to determine congressional intent, it is even more perilous in the Bankruptcy Code, since there is virtually no legislative history to speak of and that which does exist tends to be unenlightening.").

[13] *See, e.g., In re McNabb*, 326 B.R. 785, 789 (Bankr. D. Ariz. 2005) ("Legislative history is virtually useless as an aid to understanding the language and intent of BAPCPA. The section-by-section analysis in the Report of the House Committee on the Judiciary merely provides a gloss of the statutory language of BAPCPA § 322. It does not provide an example of the kind of problem or abuse it was intended to correct, nor a citation to a case whose result it sought to alter."); Jean Braucher, Rash *and Ride-Through Redux: The Terms for Holding on to Cars, Homes and Other Collateral Under the 2005 Act*, 13 AM. BANKR. INST. L. REV. 457, 461 (2005) ("[C]ourts called upon to interpret [BAPCPA] will have their work cut out for them, with no enlightening formal legislative history to aid in the task.").

sentially been a "dead letter" from the beginning of the twentieth century,[14] and there is no good reason to revive it now. The Supreme Court's most recent use —and subsequent rejection—of it was in 1955.[15] The citation in *Long*, 519 F.3d at 298, of *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892), speaks volumes, because it is that specific case that has been labeled the "prototypical case" for improperly overriding a statute's plain text in honor of its supposed "legislative intent."[16] That is why we disagree with *Long*.

2.

We agree with *Wright* and its use of state law and accordingly reject Miller's interpretation of the Code. The *Wright* court, 492 F.3d at 832, recognized that the hanging paragraph does prevent § 506 from affecting surrendered 910 vehicles under § 1325(a)(5)(C). The court then properly explained that § 506 "is [not] the *only* source of authority for a deficiency judgment." *Id.* Instead, "state law determines rights and obligations when the Code does not supply a federal rule." *Id.* (citations omitted). Using that state law, the court found that the creditor still had an unsecured deficiency judgment it could assert against the debtor.

Miller and the NACBA disagree with *Wright*, arguing that § 506 remains applicable to other parts of the Code, so there is no gap for state law to fill. That contention, however, overlooks the fundamental relationship between the Code

---

[14] John F. Manning, *Textualism and the Equity of the Statute*, 101 COLUM. L. REV. 1, 105 (2001).

[15] *Lewyt Corp. v. Comm'r*, 349 U.S. 237, 249 (1955) ("Where the taxing measure is clear, of course, there is no place for loose conceptions about the 'equity of the statute.'").

[16] ANTONIN SCALIA, A MATTER OF INTERPRETATION 18-23 (1997); *see Jaskolski v. Daniels*, 427 F.3d 456, 462 (7th Cir. 2005) ("*Church of the Holy Trinity* . . . has no modern traction.").

and state law that was clarified in *Butner v. United States*, 440 U.S. 48 (1979).

In *Butner*, the Court examined whether state law or federal bankruptcy law governs "whether a security interest in property extends to rents and profits derived from the property." *Id.* at 52. After recognizing that Article I, § 8, clause 4 of the Constitution gives Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States," the Court noted that Congress "has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Id.* at 54. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 55. The *Butner* Court therefore held that state law governed the question it was deciding.

Miller and the NACBA read *Butner* incorrectly. They envision a system in which the Code would govern all facets of a debtor's obligations and a creditor's entitlements, and state law would fill only the gaps the Code left open for it. But "the presumption runs the other way." *Wright*, 492 F.3d at 832. "Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (citations omitted). "[W]e generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are explicitly disallowed." *Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 452 (2007). Thus, after the addition of the hanging paragraph we look not only to federal law but to state law as well.

Under this reading, DC still has an unsecured debt it can pursue against Miller. Although the hanging paragraph may deny DC the use of § 506 in pursu-

ing the debt, Louisiana state law––specifically LA. STAT. ANN. §§ 6:966 and 10:9-615––makes DC an unsecured creditor.

## III.

In summary, we join the Fourth, Seventh, Eighth, Tenth, and Eleventh Circuits and agree with the deficiency position. The hanging paragraph does not allow a debtor to surrender a 910 vehicle in full satisfaction of his debt; instead, the remaining debt must be treated as an unsecured claim in the bankruptcy reorganization plan. Although the debt "need not be paid in full, any more than [Miller's] other unsecured debts, [] it [cannot] be written off *in toto* while other unsecured creditors are paid some fraction of their entitlements." *Wright*, 492 F.3d at 833.

The judgment of the bankruptcy court is REVERSED and REMANDED to the bankruptcy court for further proceedings in accordance with this opinion.