# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 13, 2020

Lyle W. Cayce
Clerk

No. 18-60384

Environmental Integrity Project; Sierra Club,

*Petitioners*,

*versus*

United States Environmental Protection Agency;
Andrew Wheeler, *in his official capacity as* Administrator of
the United States Environmental Protection Agency,

*Respondents*.

Petition for Review of an Order of the
Environmental Protection Agency
83 Fed. Reg. 12,753 (Mar. 23, 2018)

ON PETITION FOR REHEARING

Before Haynes, Graves, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

The petition for rehearing is DENIED. We withdraw our prior opinion, reported at 960 F.3d 236, and substitute the following:

We consider EPA's administration of the Title V permitting program under the Clean Air Act (the "Act"), 42 U.S.C. § 7401 *et seq.* Added to the

No. 18-60384

Act in 1990, Title V is designed to consolidate in a single operating permit all substantive requirements a pollution source must comply with, including preconstruction permits previously issued under Title I of the Act. In this case, ExxonMobil sought a revised Title V permit concerning an expansion of a plant in Baytown, Texas. Petitioners Environmental Integrity Project and Sierra Club asked EPA to object on the grounds that, in their view, the underlying Title I preconstruction permit allowing the expansion was invalid. EPA rejected Petitioners' arguments and declined to object. In so doing, EPA explained it has recently returned to its original view of Title V, under which the Title V permitting process is not the appropriate vehicle for re-examining the substantive validity of underlying Title I preconstruction permits. Petitioners ask us to review EPA's decision. Concluding EPA's interpretation of the Title V program is independently persuasive and therefore entitled to the mild form of deference recognized by *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), we deny the petition.

## I.

## A.

The Act "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003). It does so through "[a]n experiment in cooperative federalism" that divides responsibilities between EPA and the states. *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001)). EPA "formulat[es] national ambient air quality standards," *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 308 (2014), whereas the states bear the "primary responsibility" for implementing those standards, *id.*; *accord Michigan*, 268 F.3d at 1083 (EPA's "overarching role is in setting standards, not in implementation").

This case involves permits issued under Title I's New Source Review ("NSR") program, which Congress added to the Act in 1977. *See New York*

*v. EPA*, 413 F.3d 3 (D.C. Cir. 2015). The NSR program requires operators to obtain a preconstruction permit before building a new facility or modifying an old one. These permits are issued by the states, through mechanisms called state implementation plans ("SIPs"). Once a state has designed its SIP, the state must submit it to EPA. *See generally* 42 U.S.C. § 7410. EPA must review the SIP to ensure its compliance with Title I and provide notice and an opportunity to comment regarding the SIP. *Id.* § 7410(a)(2). Only if the SIP complies with the Act must EPA approve it. *Id.* § 7410(k)(3)). States periodically revise their SIPs to keep up with EPA's new substantive regulations. As with their original SIPs, states have to submit revisions to EPA, which again subjects them to notice and comment and then approves them unless they "interfere" with attainment of Title I standards. *Id.* § 7410(l).

Title I contains provisions that apply to all SIPs. Under these provisions, before breaking ground on a new facility, an operator applies to the state for a new-source permit. The state must provide notice and an opportunity to comment before it approves individual preconstruction permits. *See* 40 C.F.R. § 51.161(a). The substantive requirements for preconstruction permits differ markedly depending on whether the new source is deemed "major" or "minor." A source is major if it has "the potential to emit 100 tons per year of any air pollutant." *Util. Air Regulatory Grp.*, 573 U.S. at 310 (citing 42 U.S.C. §§ 7661(2)(B), 7602(j) (cleaned up)). The Act specifies "in considerable detail" the requirements states must meet to grant preconstruction permits to major sources. *Luminant Generation Co.*, 675 F.3d at 922 (citing 42 U.S.C. §§ 7470–7503). In contrast, the Act's requirements for minor new-source review are "sparse," allowing for "wide[]" variation "from State to State." *Id.* (citing *inter alia* 40 C.F.R. §§ 51.160–64).

Ordinarily, states must evaluate and permit every new source and every new expansion of an existing source. But in 2002, EPA promulgated a

No. 18-60384

rule that allows existing sources to expand without undergoing new-source review. *New York*, 413 F.3d at 36. Under the rule, an operator can obtain a ten-year Plantwide Applicability Limitation ("PAL") permit. *Id.* (citation omitted). The whole facility can avoid major new-source review for alterations if, as altered, the whole facility's emissions do not exceed levels specified in the PAL permit. *Id.* Here, again, states' PAL programs must be approved by EPA, following notice and comment. *See generally* 42 U.S.C. § 7410.

In 1990, Congress added Title V to the Act. Title V's purpose is to provide each source a single permit that contains and consolidates all the information it needs to comply with the Act.[1] Accordingly, "Title V does not generally impose new substantive air quality control requirements." *Sierra Club v. Johnson*, 541 F.3d 1257, 1260 (11th Cir. 2008) (citations omitted; cleaned up). Instead, it provides for individual operating permits that "contain monitoring, record keeping, reporting, and other conditions" in one place. *Id.* (citations omitted). "In a sense," then, a Title V permit "is a source-specific bible for Clean Air Act compliance." *Virginia v. Browner*, 80

---

[1] *See, e.g.*, *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 597 (D.C. Cir. 2016) ("Title V does no more than consolidate existing . . . requirements into a single document . . . without imposing any new substantive requirements." (quoting *Sierra Club v. Leavitt*, 368 F.3d 1300, 1302 (11th Cir. 2004)) (cleaned up)); *id.* (Title V's legislative history "indicates that permits' purpose is "so that the public might better determine the requirements to which the source is subject, and whether the source is meeting those requirements" (citation omitted; cleaned up)); *Sierra Club v. Johnson*, 541 F.3d 1257, 1260 (11th Cir. 2008) ("The intent of Title V is to consolidate into a single document (the operating permit) all of the clean air requirements applicable to a particular source of air pollution." (citation omitted)); *id.* (describing the Title V amendments as adding "clarity and transparency . . . to the regulatory process" and noting that "Title V does not generally impose new substantive air quality control requirements"(citations omitted)); *Leavitt*, 368 F.3d at 1302 ("Title V imposes no new requirements on sources. Rather, it consolidates existing air pollution requirements into a single document, the Title V permit, to facilitate compliance monitoring."); *see also United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 280 (3d Cir. 2013) ("Title V 'does not generally impose new substantive air quality control requirements[]' . . . ." (quoting *Johnson*, 541 F.3d at 1261)).

F.3d 869, 873 (4th Cir. 1996). Like Title I, Title V is administered mostly by the states. *La. Dep't of Envtl. Quality v. EPA* [*LDEQ*], 730 F.3d 446, 447 (5th Cir. 2013) (citations omitted). Accordingly, as with Title I, states develop their own Title V permitting programs and submit them to EPA for approval. *Id.* (citing 42 U.S.C. § 7661a(d)). A Title V permit usually contains all of the source's Title I preconstruction permits. Title V permits sometimes contain other state-approved preconstruction permits, issued pursuant to state-specific standards. Any such state permits must be designated as "state-only" or as not "federally enforceable" in the Title V operating permit. *See* 40 C.F.R. § 70.6(b)(2).

Once a state approves a Title V permit, it submits the permit to EPA for review. 42 U.S.C. § 7661d(a)(1). If the permit does not comply with Title V, EPA must object to it within forty-five days. *Id.* § 7661d(b)(1). If EPA does not object, "any person may petition" within sixty days of the end of the objection period for EPA to object. *Id.* § 7661d(b)(2). EPA then has sixty more days to decide whether to grant the petition. EPA must object to the permit "if the petitioner demonstrates to [EPA] that the permit is not in compliance with [Title V], including the requirements of the applicable implementation plan." *Id.* A denial of a petition constitutes a final agency action subject to judicial review. *Id.* Title V permits must be renewed every five years. *Id.* § 7661a(b)(5). Each renewal carries with it the petition process described above.

Title V requires each permit to include four kinds of contents: (1) "enforceable emission limitations and standards," (2) a compliance schedule, (3) a monitoring and recordkeeping requirement, and (4) "such other conditions as are necessary to assure compliance with applicable requirements of this chapter, including the requirements of the applicable implementation plan." *Id.* § 7661c(a).[2] The Act does not define "applicable

---

[2] The provision reads in whole:

requirements," but EPA has defined the term in implementing regulations to mean

> all of the following as they apply to emissions units in a [Title V] source . . . :
>
> (1) Any standard or other requirement provided for in the applicable implementation plan approved or promulgated by EPA through rulemaking under title I of the Act that implements the relevant requirements of the Act, including any revisions to that plan . . . ; [and]
>
> (2) Any term or condition of any preconstruction permits issued pursuant to regulations approved or promulgated through rulemaking under title I . . . .

40 C.F.R. § 70.2.

EPA has twice changed its interpretation of Title V and § 70.2. Immediately following Title V's passage, EPA expressed the view that a Title V permit should incorporate the source's Title I preconstruction permit limits "without further review." *In the Matter of PacifiCorp Energy, Hunter Power Plant, Order on Petition No. VIII-2016-4* [*Hunter* Order], at 11 (Oct. 16, 2017) (quoting *Proposed Operating Permit Program*, 56 Fed. Reg. 21,712, 21,738–39 (May 10, 1991)). Accordingly, a source's Title I permit "define[d]" the "applicable requirements" that must appear in a Title V operating permit pursuant to § 7661c(a) and § 70.2. *Id.* at 10 (quoting *Operating Permit Program*, 57 Fed. Reg. 32,250, 32,259 (July 21, 1992)). This reflected EPA's view that "the intent of title V is not to second-guess the

---

> Each permit issued under this subchapter shall include enforceable emission limitations and standards, a schedule of compliance, a requirement that the permittee submit to the permitting authority, no less often than every 6 months, the results of any required monitoring, and such other conditions as are necessary to assure compliance with applicable requirements of this chapter, including the requirements of the applicable implementation plan.

*Id.*

results of any State's NSR program." *Id.* (quoting *Proposed Operating Permit Program*, 56 Fed. Reg. at 21,739) (cleaned up); *see also Operating Permit Program*, 57 Fed. Reg. at 32,259 ("As stated in the May 10, 1991 proposal," the intent of certain changes to proposed program "is not to second-guess the results of any State NSR determination.").

A few years later, EPA began drifting from this view, interpreting § 70.2(1) more broadly to allow the agency to "examine the propriety of prior construction permitting decisions." *Hunter* Order at 11. In 1997, for instance, the agency construed § 70.2(1) to require that a source seeking a Title V permit must have received the correct kind of new-source permit. *Id.* at 11–12 (citing *In the Matter of Shintech, Inc., Order on Petition, Permit Nos. 2466-VO, 2467-VO, 2468-VO* (Sept. 10, 1997)). And in 1999, an EPA official issued a letter to state permitting authorities asserting that the term "applicable requirements" includes the requirement to obtain the correct preconstruction permits, which must comply with "the Act, EPA regulations, and SIP's [sic]." *Id.* at 12 (citation omitted). On this view, EPA may use Title V review to object to an "improper preconstruction determination." *Id.* (citation omitted; cleaned up).

In more recent matters, EPA has gone as far as reviewing state agencies' permitting decisions for reasonableness and arbitrariness. *Id.* at 12–13 (citing *In the Matter of American Electric Power, John W. Turk Plant, Order on Petition No. VI-2008-01* (Dec. 15, 2009); *In the Matter of Cash Creek Generation, Order on Petition Nos. IV-2008-1 & IV-2008-2* (Dec. 15, 2009); *In the Matter of Cash Creek Generation, Order on Petition No. IV-2010-4* (June 22, 2012)). And at least twice, EPA has considered whether sources permitted as minor sources should have been subject to major new-source review. *Id.* at 13 (citing *In the Matter of CEMEX, Inc.—Lyons Cement Plant, Order on Petition VIII-2008-01* (April 20, 2009); *In the Matter of Wisc. Power and Light—Columbia Generating Stations, Order on Petition No. V-2008-1* (Oct. 8, 2009)).

No. 18-60384

In 2017, however, EPA returned to its original view of Title V. In denying a petition to object to a Title V permit for a Utah power plant, EPA announced that it now construes § 70.2 such that the requirements described by subsection (1) are merely those contained in the facility's existing Title I permit. *Hunter* Order at 10. Accordingly, in Title V review, neither EPA nor state permitting authorities must determine whether the source received the right kind of preconstruction permit. It is enough that the Title V permit reflects the result of the state preconstruction permitting decision. The result of that process, whether it be a major or minor permit or no permit at all, "define[s]" the source's requirements "for purposes of title V permitting." *Id.* (quoting 57 Fed. Reg. 32,250, 32,259 (July 21, 1992)).[3]

## B.

In 2005, the Texas Commission on Environmental Quality ("TCEQ") issued a PAL permit for ExxonMobil's Baytown Olefins Plant (the "Plant"). This particular permit is called PAL6. It includes the Plant's plantwide applicability limits, such that any expansion within those limits will not trigger major new-source review. PAL6 was incorporated into the Plant's Title V permit in 2006. *See In the Matter of ExxonMobil Corp., Baytown Olefins Plant, Order on Petition No. VI-2016-12*, at 7 (Mar. 1, 2018).[4]

In 2012, ExxonMobil applied for a Title I preconstruction permit to build a new ethylene production facility (the "Facility") at the Plant. PAL6 allowed the Facility to circumvent "major" new-source permitting

---

[3] The Tenth Circuit recently decided an appeal directly from the *Hunter* Order. *See Sierra Club v. EPA*, 964 F.3d 882 (10th Cir. 2020). It held the *Hunter* Order contradicts § 70.2's definition of "applicable requirements," which, according to the court, "unambigiously refers to all requirements in a [SIP], . . . including . . . requirements for major NSR." *Id.* at 891. The *Hunter* Order's reasoning is discussed at greater length below.

[4] EPA has approved Texas's Title I SIP, 40 C.F.R. § 52.2270, its PAL program, *Final Rule, Revisions to the NSR State Implementation Plan, Texas*, 77 Fed. Reg. 65,119 (Oct. 25, 2012), and its Title V permitting program, *Clean Air Act Full Approval of Operating Permits Program; State of Texas*, 66 Fed. Reg. 63,318 (Dec. 6, 2001).

requirements, and so ExxonMobil applied for and ultimately received a "minor" new-source permit. Environmental Integrity Project, Sierra Club, and Air Alliance Houston[5] filed comments and requested a contested case hearing before the Texas State Office of Administrative Hearings. They challenged the Facility's preconstruction permit, arguing the Facility should have required a major new-source permit. This is because, in their view, PAL6 contravenes federal PAL rules, such that it cannot validly shield the Facility from major new-source permitting. After a hearing, two administrative law judges from Texas's Office of Administrative Hearings ruled against the groups. TCEQ then issued a minor new-source permit for the Facility.

ExxonMobil applied to TCEQ to modify the Plant's Title V permit to incorporate the minor new-source permit. Petitioners again filed comments, reiterating their argument that PAL6 was invalid. Despite their comments, TCEQ submitted the revised Title V permit to EPA for review. EPA did not object. Accordingly, TCEQ issued the permit. Petitioners could have, *see* 42 U.S.C. § 7661a(b)(6), but did not appeal TCEQ's decision to a Texas state court. Instead, in August 2016, the groups petitioned EPA to object to the Title V permit.

EPA denied the petition. Relying on the *Hunter* Order, the agency explained that

> [w]here the EPA has approved a state's Title I permitting program, duly issued preconstruction permits will establish the 'applicable requirements,' and the terms and conditions of those permits should be incorporated into a source's Title V permit without further review.

---

[5] Air Alliance Houston is not a party to this appeal.

Because "any such challenges should be raised through the appropriate Title I permitting procedures or enforcement authorities," EPA would not object to the Title V permit.

Petitioners timely sought our review.

## II.

We will overturn EPA's denial of the petition only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *accord Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496–97 (2004). "The scope of review under the 'arbitrary and capricious' standard is narrow." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action will be overturned only if it is contrary to statute or "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Petitioners must "demonstrate[] . . . that the permit is not in compliance with the requirements of" Title V. 42 U.S.C. § 7661d(b)(2). Only that showing triggers EPA's duty to object to the permit. *LDEQ*, 730 F.3d at 447.

## III.

This dispute centers on an agency's interpretation of a statutory scheme that Congress has charged it with administering. In such a dispute, we ordinarily decide first whether and to what degree to defer to the agency's interpretation. *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 425 (5th Cir. 2016) (determining what level of deference to accord to "EPA's interpretation of the Clean Air Act"). EPA claims the *Hunter* Order, which undergirds its action here, is entitled to *Chevron* deference. *See generally Chevron, U.S.A.,*

*Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, we defer to an agency's interpretation when it reasonably resolves a genuine statutory ambiguity. *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (citing *Chevron*, 467 U.S. at 842–45). EPA argues that the term "applicable requirements" in § 7661c(a)[6] is ambiguous because it compels neither Petitioners' construction (that "applicable requirements" includes all the Act's requirements, regardless of the contents of any preconstruction permit) nor EPA's construction (that Title V does not require EPA to revisit preconstruction permitting decisions). EPA's resolution of this ambiguity is reasonable, the agency claims, because it is "better as a matter of policy and better comports with the statutory structure and the principal purpose of the Title V program." In turn, Petitioners respond that there is no ambiguity for EPA to resolve. They argue that the term "applicable requirement" is not ambiguous but instead is simply "broad and sweeping," encompassing *all* the Act's requirements as applied to a particular source, not just the requirements that happen to be contained in a Title I new-source permit.

We need not decide whether the *Hunter* Order is entitled to *Chevron* deference because, independent of *Chevron*, we find its reasoning persuasive as a construction of the relevant provisions of Title V. We therefore accord the *Hunter* Order the deference "its persuasiveness warrants." *Union*

---

[6] Although EPA's brief claims in passing that the agency "reasonably interpreted the statute *and regulation*," the agency develops no argument as to the latter, relying only on *Chevron* deference. We note that the *Hunter* Order itself and EPA's order in this matter both claim to interpret not § 7661c(a) but instead § 70.2. And in defending the *Hunter* Order in the Tenth Circuit, EPA invoked not only *Chevron* but *Auer* deference, under which courts "defer[] to agencies' reasonable readings of genuinely ambiguous *regulations*." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019) (citing *Auer v. Robbins*, 519 U.S. 452 (1997), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)) (emphasis added); *see* Resp't EPA's Br. 42–44, *Sierra Club v. EPA*, No. 18-9507 (10th Cir. Nov. 7, 2019). Accordingly, the Tenth Circuit's opinion in *Sierra Club* addressed the *Hunter* Order's compliance with the definition of "applicable requirements" in § 70.2. 964 F.3d at 891. EPA does not invoke *Auer* here, and we express no view on whether *Auer* deference applies to the *Hunter* Order.

*Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 580 (D.C. Cir. 2016) (citing inter alia *Skidmore*, 323 U.S. 134); *see also id.* ("[W]here the deference we should accord an agency interpretation is unclear, 'we need not reach the question of *Chevron* deference' if the [agency's] interpretation 'satisfies the requirements for *Skidmore* deference.'" (quoting *Brown v. United States*, 327 F.3d 1198, 1205 (D.C. Cir. 2003))). *Skidmore* deference is a weaker form of deference that accords "weight" to an agency's judgment depending on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Dhuka v. Holder*, 716 F.3d 149, 154 (5th Cir. 2013) (quoting *Skidmore*, 323 U.S. at 140); *see also, e.g.*, *Employer Solutions Staffing Grp. II, LLC v. Office of Chief Admin. Hearing Officer*, 833 F.3d 480, 480 (5th Cir. 2016) (observing *Skidmore* accords "a measure of deference proportional to the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade" (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012) (internal quotation marks omitted)). Even assuming *arguendo* that only *Skidmore* deference applies, under that standard we find persuasive EPA's position that Title V does not require revisiting the validity of underlying Title I preconstruction permits as part of the Title V permitting process.[7]

## IV.

Applying *Skidmore*, we ask whether EPA's interpretation of Title V in the *Hunter* Order is persuasive. Specifically, we inquire into the

---

[7] The *Hunter* Order is framed largely as an interpretation of 40 C.F.R. § 70.2, which in turn implements § 7661c(a). *See Hunter* Order at 9–10 (describing definitions of "applicable requirements" in §§ 70.2(1) and (2)). Nonetheless, we will analyze the *Hunter* Order as a construction of Title V and the Act as a whole. This accords with EPA's treatment of the *Hunter* Order in this litigation, *see supra* n.6.

persuasiveness of EPA's current view that the Title V permitting process does not require substantive reevaluation of the underlying Title I preconstruction permits applicable to a pollution source. As we read it, the *Hunter* Order defends the agency's interpretation based principally on Title V's text, Title V's structure and purpose, and the structure of the Act as a whole. Having examined these reasons and found them persuasive, we conclude that EPA's current approach to Title V merits *Skidmore* deference.

## A.

We first consider EPA's treatment of Title V's text. The *Hunter* Order argues that Petitioners' argument is fatally undermined principally not by what Title V includes but by what it omits: an explicit requirement that EPA review the "substantive adequacy" of underlying preconstruction permits during the Title V process. *Hunter* Order at 14 (citation omitted). The Order reasons that Title V contains no requirement that its "consolidation process . . . involve a review of the substantive adequacy" of preconstruction requirements, an undertaking that "would entail much more than taking steps to consolidate existing air pollution requirements." *Id.* (quoting *U.S. Sugar Corp.*, 830 F.3d at 597) (cleaned up). Nowhere, avers the agency, does Title V permitting require the state permitting authority or EPA to double-check whether preconstruction permits "properly derived" from the preconstruction rules. Nor does Title V require these requirements to "be re-checked every time the [Title V] permit is renewed." *Id.*

We find persuasive EPA's position that Title V lacks a specific textual mandate requiring the agency to revisit the Title I adequacy of preconstruction permits. Our own review of Title V confirms that it contains no such explicit requirement, nor any language guiding the agency on how to perform a review of that nature. "The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it." *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017) (citation omitted). A number of cases have identified the *casus omissus pro omisso habendus est* canon, under which a

statute should not be read to include matter it does not include. *See, e.g.*, *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (rejecting construction that "would have us read an absent word into the statute" because it "would result not in a construction of the statute, but, in effect, an enlargement of it by the court" (citing *Iselin v. United States*, 270 U.S. 245, 251 (1926)) (cleaned up)). Here, Title V does not tell EPA to reconsider new-source review in the course of Title V permitting. We reject Petitioners' position because "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *In re Miller*, 570 F.3d 633, 638–39 (5th Cir. 2009) (quoting *Lamie*, 540 U.S. at 538) (cleaned up).

EPA contrasts Title V's silence on this front with more stringent oversight authority provided in Title I, arguing that this "supports reading the title V provision to supply a more limited oversight role for the EPA with regard to state implementation of preconstruction permitting programs." *Hunter* Order at 14. The agency explains that Title I is better geared for "in-depth oversight of case-specific" state permitting decisions "such as through the state appeal process or an order or action under section[] 113 or section 167." *Id.* And, the agency urges, the absence of such schemes in Title V shows Congress did not intend to recapitulate the Title I process in Title V. *See, e.g.*, *id.* at 13 n.26 (explaining that "an interpretation of title V that excludes revisiting preconstruction decisions does not fundamentally alter or limit the EPA's authority under title I of the Act"). We find this reasoning persuasive. *Cf. Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1658–59 (2017) (Congress's "drafting decision" not to include statutory language from a comparable statute "indicates that Congress did not in fact want" to do so (citing *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1235 (2014))).

Petitioners' disagreement with the agency's view boils down to their argument that the term "applicable requirements" in § 7661c(a) requires

EPA to review preconstruction permitting decisions. According to Petitioners, that term encompasses *all* the Act's requirements as applied to a particular source, and not simply the requirements that happen to be contained in a Title I new-source permit. Contrary to EPA's view, Petitioners argue the term "applicable requirements" is not ambiguous but is simply "broad and sweeping." *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) ("[T]he Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application." (citing *New York v. FERC*, 535 U.S. 1, 22 (2002))). The agency counters that Title V's requirement that a permit "assure compliance with applicable requirements" is "general" and "broad" and so does not "clearly or specifically" require revisiting preconstruction permitting decisions. *Hunter* Order at 15. The general term, says EPA, does not send a "clear indication" that Congress intended Title V to "alter the [agency's] balance of oversight" over state permitting processes. In other words, the agency advances the familiar argument that Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

We conclude EPA has the better reading of § 7661c(a). While "applicable requirements" may be a "broad and sweeping" phrase in the abstract, its context here narrows its scope. The provision reads in whole:

> Each permit issued under this subchapter shall include enforceable emission limitations and standards, a schedule of compliance, a requirement that the permittee submit to the permitting authority, no less often than every 6 months, the results of any required monitoring, and *such other conditions as are necessary to assure compliance with applicable requirements of this chapter*, including the requirements of the applicable implementation plan.

42 U.S.C. § 7661c(a) (emphasis added). Read in context, the "applicable requirements" clause is residual to the three listed contents: "enforceable emission limitations and standards," a compliance schedule, and a periodic monitoring report. Residual clauses are often phrased broadly; wrenched out of context, they might appear to encompass far more than the preceding terms. That is why courts construe residual terms in light of those preceding terms. *See, e.g.*, *United States v. Buluc*, 930 F.3d 383, 388–89 (5th Cir. 2019) (discussing *eiusdem generis* canon under which "when a general term follows a specific one, the general terms should be understood as a reference to subjects akin to the one with the specific enumeration" (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008)) (cleaned up)). Here, Petitioners read the residual clause—"other conditions as are necessary to assure compliance with applicable requirements"—to leap far beyond the enumerated contents. They would effectively rewrite the clause to read: "a *de novo* reconsideration of the source's preconstruction permitting." Surely, Congress would not have hidden that regulatory elephant in this residual mousehole.

## B.

We next consider EPA's contention that its revised interpretation of Title V permitting "is better aligned with the structure and purpose of [T]itle V itself." *Id.* at 14. The *Hunter* Order notes that Title V was not intended to "add new substantive requirements" to the Act. *Id.* (citations omitted). Instead, Title V's goal was to "streamline." *Id.* at 16 (quoting 42 U.S.C. § 7661a(b)(6)). EPA expressed this view before enacting 40 C.F.R. part 70, observing that "the intent of [T]itle V is not to second-guess the results of any State's NSR program." *Id.* at 11; *see also Proposed Operating Permit Program*, 56 Fed. Reg. at 21,738–39 (May 10, 1991); *accord Operating Permit Program*, 57 Fed. Reg. at 32,259 ("As stated in the May 10, 1991 proposal," the intent of certain changes to proposed program "is not to second-guess the results of any State NSR determination."). EPA proffers this statement

as "the best indication" of the agency's intention "when it issued" part 70. *Hunter* Order at 13. According to EPA, "[m]uch as an agency's contemporaneous interpretation of a statute through a regulation is given great weight[,] an agency's contemporaneous interpretation of its own regulations in the preamble for those regulations should carry similar weight." *Id.* at 14.[8]

We find persuasive EPA's view that, because Title V was not intended to "add new substantive requirements" to the Act, it should not be interpreted as Petitioners urge. *Id.* at 14 (citations omitted). By all accounts, Title V's purpose was to simplify and streamline sources' compliance with the Act's substantive requirements. Rather than subject sources to new substantive requirements—or new methods of reviewing old requirements— "[t]he intent of Title V [was] to consolidate into a single document (the operating permit) all of the clean air requirements applicable to a particular source of air pollution." *Johnson*, 541 F.3d at 1260 (citation omitted); *see also, e.g.*, *U.S. Sugar Corp.*, 830 F.3d at 597 ("Title V does no more than consolidate existing . . . requirements into a single document . . . without imposing any new substantive requirements." (citation omitted; cleaned up)); *Leavitt*, 368 F.3d at 1302 ("Title V imposes no new requirements on sources. Rather, it consolidates existing air pollution requirements into a single document, the Title V permit, to facilitate compliance monitoring."). The Title V permitting process was meant to add "clarity and transparency . . . to the regulatory process to help citizens, regulators, and polluters themselves understand which clean air requirements apply to a particular source of air pollution." *Johnson*, 541 F.3d at 1260. This goal, as EPA argues, is at cross-purposes with using the Title V process to reevaluate preconstruction permits.

---

[8] *But see Sierra Club*, 964 F.3d at 893–95 & n.10 (holding that language from the preambles to the proposed and actual operating programs contradicts § 70.2's text).

We also agree with EPA that the language in part 70's preamble is probative of Title V's purpose as a whole. *See, e.g.*, *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 414 (1993) (finding agency's construction of newly enacted law "particular[ly] relevan[t]" (citation omitted)). This is because one sensibly expects EPA to have had a better grasp of Congress's intent for Title V shortly after its enactment. *See, e.g.*, *Udall v. Tallman*, 380 U.S. 1, 16 (1965) (according "[p]articular[] . . . respect . . . when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new" (citation omitted; cleaned up)). Mere months after Title V's enactment, EPA stated that Title V permits are to "incorporate" the standards contained in Title I preconstruction permits *without further review*." *Proposed Operating Permit Program*, 56 Fed. Reg. at 21,738–39 (emphasis added). If that were not enough, EPA stated flatly that "[t]he intent of [T]itle V is not to second-guess the results of any State NSR program." *Id.* at 21,739.

We recognize that EPA has reverted to its original interpretation of § 70.2, reflecting its changing views of Title V. We take the agency's change of position into account in determining whether to defer to its position. *See Dhuka*, 716 F.3d at 154 (whether to defer under *Skidmore* depends in part on agency's "consistency with earlier and later pronouncements"). But even when "the agency has embraced a variety of approaches," we may still defer to its present position, "especially" when the current view "closely fits the design of the statute as a whole." *Shalala*, 508 U.S. at 417–18 (citation omitted; cleaned up); *see also id.* at 417 ("The [agency] is not estopped from changing a view [it] believes to have been grounded upon a mistaken legal interpretation." (citation omitted)).

Finally, we are persuaded that Petitioners' capacious view of Title V review is at odds with the "abbreviated" timeline Congress gave EPA.

*Hunter* Order at 16. EPA has forty-five days to conduct an independent review of a Title V permit. 42 U.S.C. § 7661d(b). If anyone petitions EPA, it has sixty more days to decide whether to object to a petition. *Id.* We agree that these timelines are "inconsistent with an in-depth and searching review of every" permitting decision regarding a given source. *Hunter* Order at 16.[9] We also observe that the fact that Title V permits must be renewed every five years, *see* 42 U.S.C. § 7661a(b)(5), tends to support the agency's view that Title V was not intended to serve as a vehicle for re-examining the underlying substance of preconstruction permits. Subjecting a source's preconstruction permit to periodic new scrutiny, without any changes to the source's pollution output, would be inconsistent with Title V's goal of giving sources more security in their ability to comply with the Act. *See id.* § 7661a(b)(6).

## C.

Beyond the structure of Title V, EPA also persuasively grounds its interpretation in the structure of the Act as a whole. According to EPA, when Congress added preconstruction permitting requirements to Title I in 1977, it "understood that the adequacy of state preconstruction permitting decisions would be subject to review in state administrative and judicial forums." *Hunter* Order at 13. It gave EPA oversight authority over preconstruction permitting only in specific ways, to do specific things. For example, Congress delineated the processes EPA must go through to approve SIPs. *Id.* at 14–15 (citing § 7410(a)(2)(C)). When it enacted Title V thirteen

---

[9] Making a similar point, EPA points out that the Act requires states to issue Title V permits through

> *streamlined[] and reasonable procedures for expeditiously determining* when applications are complete, for processing such applications, for public notice, including offering an opportunity for public comment and a hearing, and for expeditious review of permit actions, including applications, renewals, or revisions.

42 U.S.C. § 7661a(b)(6) (emphasis added).

years later, Congress granted EPA no such authority. *Id.* at 15. Congress gave no "clear indication" that it intended to "alter the balance of oversight" EPA has over state permitting processes. Section 7661c(a)'s requirement that a Title V permit "assure compliance with applicable requirements" is "general" and "broad" and does not "clearly or specifically" require the revisiting of preconstruction permitting decisions. *Id.* Once again, the "elephants in mouseholes" canon supports this reading. *Id.* (quoting *Whitman*, 531 U.S. at 468).

We find persuasive the agency's view that the Act's overall structure supports its interpretation of Title V. We have frequently noted the Act's "experiment in cooperative federalism." *Luminant Generation Co.*, 675 F.3d at 921 (quoting *Michigan*, 268 F.3d at 1083); *see also Texas*, 829 F.3d at 411 (same). Applied to NSR, this principle of federalism means it is the states, not EPA, that issue preconstruction permits for new sources. *See generally* 42 U.S.C. § 7410. And it is the states, not EPA, that issue Title V permits. *Id.* § 7661a(d); *see also LDEQ*, 730 F.3d at 447 (Title V is administered mostly by the states (citations omitted)). While EPA retains near-plenary authority to approve or recall SIPs it finds inconsistent with the Act, 42 U.S.C. § 7410(k), the *Hunter* Order is correct that the agency's authority over improperly issued preconstruction permits generally stops there. *See generally Hunter* Order at 14–16 (describing EPA's authority to review preconstruction permits). While § 7661c(a) requires permits to contain conditions necessary to "assure compliance with applicable requirements," we agree with EPA that this requirement is too "general" and "broad" to upset the Act's balance of power between EPA and the states. *Id.* We thus agree that when it enacted Title V, Congress gave no "clear indication" that it intended to "alter the balance of oversight" EPA has over state permitting processes. *Hunter* Order at 15. As discussed above, Petitioners' contrary view puts too much weight on § 7661c(a)'s residual clause.

For similar reasons, we are persuaded by the agency's contrasting Title V against Title I's more detailed procedures for "in-depth oversight of case-specific" permitting decisions. *Id.* at 14. Such permitting decisions follow state appeals or enforcement actions authorized by other provisions of the Act, including citizen suits under Title III. *Id.* Those mechanisms are better structured to provide agency and citizen oversight of preconstruction permitting. *Id.* Petitioners' contrary view would make Title V a vehicle for the public to (again) challenge preconstruction permits. But Title V contains none of the procedures that would guide those challenges, as Titles I and III do. *Id.*

Finally, according to the Order, EPA's position also "respects the finality" of the preconstruction permitting decision. *Id.* at 18. The agency reasoned that it would be "inefficient" to allow review via the Title V permitting process even after the preconstruction permits had been subject to "public notice and comment and an opportunity for judicial review." *Id.* at 17. And those avenues provide "more time for development and consideration of the potential issues." *Id.* at 17–18. We are persuaded that EPA's construction of Title V "respects the finality" of state preconstruction permitting decisions, which is consistent with the Act's "cooperative federalism." *Luminant Generation Co.*, 675 F.3d at 921. Petitioners' contrary view of Title V would allow a federal agency to upset states' permitting decisions with no clear mandate from Congress to do so.[10]

\* \* \*

We emphasize that nothing in this opinion prevents Petitioners from continuing to challenge the Facility's compliance with the Act in other

---

[10] Because we hold that EPA need not reconsider the validity of Title I preconstruction permits under Title V, we do not reach EPA's alternative argument that Petitioners have failed to demonstrate PAL6 and the Facility's Title I permit are substantively invalid.

contexts. As the agency's order in this case explained, "a decision by the EPA not to object to a title V permit that includes the terms and conditions of a title I permit does not indicate that the EPA has concluded that those terms and conditions comply with the applicable SIP or the [Act]." For instance, the agency observed that "ExxonMobil has submitted a request to renew PAL6," giving "the public the opportunity to participate in [a] future PAL permit proceeding, including the opportunity to comment on any relevant outstanding concerns with PAL6." And, of course, Petitioners remain free within the Act's bounds to enforce its substantive provisions should the Facility violate them. *See generally* 42 U.S.C. § 7604 (authorizing citizen suits to enforce violations).

All we address here is EPA's view that Title V permitting is not the appropriate vehicle for reexamining the substantive validity of underlying Title I preconstruction permits. We conclude that the agency's interpretation is persuasive and therefore entitled at least to *Skidmore* deference.

The petition is DENIED.